No. 2--04--0215

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Du Page County.

)

Plaintiff-Appellee, )

) 

v. ) No. 02--CF--3602
      

)

ALAJANDRO ORTIZ, ) Honorable

) Perry R. Thompson,

Defendant-Appellant. ) Judge, Presiding.

______________________________________________________________________________

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Alajandro Ortiz, appeals the circuit court of Du Page County's denial of his motion to quash arrest and suppress evidence and his subsequent conviction of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2002)).  Concluding that police officers had probable cause to arrest defendant, and that the evidence presented at trial was sufficient to sustain his conviction, we affirm. 

I.  BACKGROUND

In a two-count indictment, defendant was charged with unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2002)) and armed violence (720 ILCS 5/33A--2(a) (West 2002)).  Defendant filed a pretrial motion to quash arrest and suppress evidence, alleging that the police lacked probable cause to arrest him. 

At the hearing on defendant's motion, defendant called Detective Larry Weiss, supervisor of the narcotics unit of the Du Page County sheriff's department.  On December 10, 2002, Detective Weiss was one of the team members conducting surveillance of Detective Tony Davis's undercover purchase of two kilograms of cocaine from a man named Enrique, in the parking lot at 534 Valerie Lane, Addison, Illinois.  Detective Weiss explained that a police informant working with Detective Davis orchestrated the drug deal with a man named Sam Perez, of 534 Valerie Lane, apartment number 8.  Enrique was expected to arrive in an older model Nissan Maxima, tan or brown in color, with a temporary license plate.  The officers set up surveillance at approximately 1 p.m.  Detective Weiss parked his undercover vehicle at the corner of Green Meadows Drive and Addison Road.  Detective Weiss was in two-way radio contact with all the other officers working the operation except Detective Davis, who was wearing a wire through which Detective Weiss and the other officers could hear him.  Detective Weiss received information from other officers that the Nissan was in route, traveling on Lake Street.  Next, Detective Weiss observed the Nissan drive past him on Green Meadows in a westerly direction, with a red Ford F150 pickup truck traveling "not even feet" behind the Nissan.  The red pickup truck was occupied by "two male Mexicans."  The driver was later identified as Juan Moreno and the passenger as defendant.  Detective Weiss observed the Nissan and the red pickup truck turn into the parking lot at 534 Valerie Lane and then travel out of his line of sight.  

Detective Weiss next saw the red pickup truck when he drove from his location and met the red pickup truck leaving the other end of the parking lot onto Elizabeth Drive.  As the red pickup truck attempted to leave the parking lot, Detective Weiss put the front of his undercover vehicle bumper to bumper with the front of the red pickup truck while another officer moved his vehicle behind the red pickup truck to prevent it from backing up.  Detective Weiss went to the passenger side of the red pickup truck with his revolver drawn and ordered defendant to put his hands up and to get out of the vehicle.  Defendant complied and was handcuffed.  Both defendant and the driver of the red pickup truck were placed under arrest, the red pickup truck was searched, and two handguns were recovered from a hidden compartment in the dashboard.  Prior to arresting defendant, Detective Weiss did not ask defendant for his driver's license.  When asked whether he knew if the occupants of the red pickup truck were connected to the drug transaction, Detective Weiss replied, "I didn't know.  I felt they were, but I didn't know."  Detective Weiss also said that he did not see the occupants of the red pickup truck make any gestures toward the occupants of the Nissan and that the driver of the red pickup truck did not commit any traffic violations.  Detective Weiss admitted that, at the time the undercover operation commenced, he had no information about defendant's involvement in the sale of the cocaine.

On cross-examination by the State, Detective Weiss testified that he had 15 years' experience in the investigation of narcotics crimes and had been involved in over 1,000 undercover narcotics deals,  100 of which involved the purchase of over half a kilogram of cocaine.  Detective Weiss said that surveilling an undercover drug transaction involves looking for countersurveillance, that is, someone else who may be watching the drug deal.  Detective Weiss explained that either suppliers of the drugs, distancing themselves from the transaction, or persons serving as security for the drug dealer often perform countersurveillance.  Detective Weiss said that countersurveillance is quite common when a drug deal is large like the one orchestrated in this case, which entailed two kilograms of cocaine for $38,000.  Detective Weiss first saw the Nissan and the red pickup truck when the vehicles were headed north on Addison Road.  The red pickup truck was less than a car length behind the Nissan, and the vehicles were traveling in the inside or fast lane, not the curb lane.  Detective Weiss indicated that the vehicles were traveling well below the posted speed limit, such that vehicles in the curb lane of Addison Road were passing them.  The Nissan and the red pickup truck stopped where Addison Road intersects with Green Meadows, let traffic clear, and then turned west onto Green Meadows.  According to Detective Weiss, once the vehicles made the turn onto Green Meadows, they traveled at almost idle speed to the parking lot.  Weiss explained further that if the driver of the red pickup truck had not intended to remain behind the Nissan, he could have passed, as there was no eastbound traffic on Green Meadows at the time.  The way the two vehicles were traveling and the fact that each vehicle was occupied by two male Hispanics caused Detective Weiss to conclude that the vehicles were traveling together.  The red pickup truck turned into the parking lot, right behind the Nissan, and the vehicles traveled out of Detective Weiss's line of sight.  Detective Weiss radioed an account of his observations to the other officers working surveillance of the operation, but not to Detective Davis.  Detective Weiss told the other officers that he would take the red pickup truck.  The prearranged arrest signal was Detective Davis stating that it was his birthday.  After the arrest signal was given and officers began to close on the vehicles, the red pickup truck began moving at a faster rate toward the exit of the parking lot.

On redirect examination by defense counsel, Detective Weiss indicated that he did not see defendant do anything except sit in the passenger seat of the red pickup truck; that he did not see any gestures made between the men in the red pickup truck and the men in the Nissan; and that he received no information from other officers that the red pickup truck stopped at or near the location where the drug transaction was conducted.  Detective Weiss said that he made the decision to stop the red pickup truck himself because he was suspicious, he felt that the occupants of the red pickup truck were involved in the drug transaction, and he had a hunch that the red pickup truck was involved in the drug transaction.  Detective Weiss did not ask defendant any questions before patting defendant down and placing him under arrest.

The State called Detective Tony Davis of the Du Page County sheriff's department, who testified that a police informant told him that the informant could buy cocaine from Perez, who lived at 534 Valerie Lane and who got his cocaine from Enrique Fuentes.
(footnote: 1)  The informant told Detective Davis that, on November 29, 2002, the informant and Perez went to 2334 North Tripp in Chicago, the home of Fuentes.  At that time and place, the informant saw a kilogram of cocaine.  According to the informant, an unknown man, whom he later identified as the driver of the red pickup truck, was present at Fuentes's house on November 29, 2002.  On December 4, 2002, Detective Davis and the informant went to 534 Valerie and met with Perez and Fuentes.  Although Detective Davis learned from officers performing surveillance of 2334 North Tripp that the Nissan Maxima left that address and headed toward Addison on December 4, 2002,  no drug transaction occurred that day.

On December 10, 2002, Detective Davis and the informant were in an undercover vehicle in the parking lot at 534 Valerie, with the purpose of purchasing two kilograms of cocaine from Fuentes.  The informant told Detective Davis that Fuentes carries a gun "every now and then."  Detective Davis was not able to hear the radio traffic of the other officers performing surveillance of the operation.  However, Detective Davis was wearing a wire and the other officers could hear him.  While waiting in the parking lot, Detective Davis had a telephone conversation with Fuentes, who told him that he was in the vicinity, driving a Nissan Maxima.  Detective Davis gave that information to the other officers.  At some point, Davis observed a 1993 goldish-brown Nissan Maxima enter the parking lot, with a red pickup truck directly behind it.  The Nissan pulled past Detective Davis's undercover vehicle, and he and the Nissan's occupants acknowledged one another as the Nissan passed.  Meanwhile, the pickup truck moved at a slow pace through the parking lot.  As Detective Davis and the informant exited the undercover vehicle, Detective Davis saw the occupants of the red pickup truck turn their heads and look behind them toward Detective Davis and the Nissan.  Detective Davis did not recognize the occupants of the pickup truck, but the informant told him later that he recognized the driver as the man he saw at Fuentes's house on November 29, 2002.  Detective Davis approached Fuentes and the driver of the Nissan, later identified as Jose Cortez.  Fuentes told Detective Davis to go get his money.  Detective Davis said "let me see the stuff first."  Fuentes unbuttoned his jacket and showed Detective Davis two objects in his waistband that appeared to be two kilograms of cocaine.  At that point Detective Davis gave the prearranged arrest signal and other officers came and arrested Fuentes and Cortez.  A 1-minute-and-45-second audiotape produced by the electronic device Detective Davis wore during the undercover operation was played at the hearing.  The transcript of that recording was admitted into evidence and provided:

"DAVIS: Okay, I think there's a Maxima pulling in right now.  Brown Maxima. Anybody got an eyeball?  Brown Maxima pulling in towards me.  And there's a red pickup truck too.  Alright this is him in a brown Maxima.  Temporary plates.

(Inaudible)

DAVIS: Yes.  We're going for them until they get out.  Get 'em under there.

(Inaudible)

DAVIS: What's up man?

[FUENTES]: Let's go inside.  You got that money?

DAVIS: Yep.  It's in the car.

CORTEZ: How you doing?

DAVIS: What's up?  Tony man.

CORTEZ: Jose[.]

DAVIS: Nice meeting you man.  Hey, I gotta get back to work man.  We gonna do this or what?

[FUENTES]: Yeah.

DAVIS: I gotta hurry.

[FUENTES]: Yeah.

DAVIS: Can I ... you saw my money can I look at it and see what you... if you got some right away?

[FUENTES]: I got it with me.

DAVIS: Whoaa, wait, wait, wait, wait, wait... hold on man!

[FUENTES]: I got it on me.

DAVIS: Alright, call... call him.  Did he go upstairs?  Because he was walking around here looking for you.

[FUENTES]: Yeah.  Let's go inside and talk to him ...

DAVIS: We gotta do this shit man.  It's my birthday today man.  I wanna get this shit done.  I'm late for work and shit like that man.  Come on!

[FUENTES]: Where's my money?

DAVIS: That door don't open.  My wife gonna kill my ass man.  It's my birthday and I don't have Jack.  Did you call him?

[FUENTES]: (Inaudible)

POLICE: Don't move!  Get down!  (Yelling) down, down, down, on the ground.

DAVIS: Hell, good we got the red pick-up.

POLICE: Yeah.  (Inaudible)

POLICE: Where's Sam?  Where's Sam? Where's Sam? 

DAVIS: He's in the apartment.

POLICE: Go, go.

DAVIS: Number 8."

On cross-examination, Detective Davis admitted that his incident report for this case does not indicate that the red pickup truck's occupants turned and looked behind them as the red pickup truck traveled through the parking lot.  Detective Davis said that he did not know who the two individuals in the red pickup truck were when he first saw them.  The informant did not tell him that the driver of the red pickup truck was the man he saw at Fuentes's house on November 29, 2002, until after all the arrests were made.  When Detective Davis spoke to Fuentes on the telephone just before Fuentes's arrival at the parking lot, Fuentes said he was traveling on Lake Street in a Nissan Maxima, but Fuentes said nothing about a red pickup truck following him.  Detective Davis said that the Nissan and the red pickup truck "came into the parking lot together simultaneously behind each other."  Detective Davis also said that when the occupants of the Nissan got out of the vehicle they did not wave or do anything toward the occupants of the red pickup truck.

In denying defendant's motion, the trial court commented:

"I think it's important to look at these factors with light of common sense.  Here we have two vehicles--well, let me backup.  We have some information that we know from prior transactions between some parties in this, not your client, not [defendant].  We have then knowledge about a type of car.  The type of car is confirmed.  We have then this driving in tandem from Lake Street which is on the south side of People's No. 1, driving north on Addison Road in tandem.  The usual means of driving in tandem to the point that it's pretty clear these are people working together in terms of a common goal.  We don't know what the purpose of the goal is yet, whatever, but they know each other.  They are driving together.  The slow speed in the passing lane, the turn, the following so closely, the turning again, the following so closely, and then the period of time in the parking lot which we know is a total length of a tenth of a mile, the period of time to traverse that lot.

We do have the red pick up truck occupants.  Davis's testimony looking back at the transaction as its happening.  The exception[al], slow speed.  It's pretty clear I think to anyone with common sense application that they are interested in what's going on.  They are watching what's going on.  That's sort of the definition of surveillance.  You are watching what's happening.

We have then the informant's knowledge, Officer Davis's knowledge, Officer Weiss's knowledge and observations and experience, and I think Fox and all of the other cases ask us to look at the collective evidence, all of the evidence, the totality of the evidence, I could quote from Fox on page five, which is at 508 Northeast Second, 475, first paragraph from the bottom, on the left column when the defendant argues that the sharing and exchange of defendant's participation of the crime is necessary before an arrest.  We reject that interpretation.  Well, officers are [acting] in concert in investigating a crime or possible crime, probable cause can be established from all of the information collectively received by the officers even if not known to the arresting officer.  It was Officer Weiss even though he doesn't know it, knows everything that Davis knows and the informant knows.  With that guideline, I'm going to deny the motion to suppress.  I find probable cause for the arrest of [defendant]."

Thereafter, defendant waived his right to trial by jury and the matter proceeded to bench trial on September 22, 2003.  The parties stipulated to the evidence that was presented at the hearing on defendant's motion to suppress and to the testimony of a forensic scientist who would testify that she tested the two bricks of cocaine recovered in this case, that each tested positive for cocaine, and that each weighed in excess of 900 grams.  Detective Davis identified the two bricks of cocaine that he recovered and described them as being wrapped in black duct tape.  Deputy Stjepan Josic of the Du Page County sheriff's department testified that he searched the red pickup truck on December 10, 2002, and discovered two loaded handguns hidden under a panel in the dashboard.  The State also called Leroy Keith, of the Du Page County sheriff's department crime laboratory, and established him as an expert latent fingerprint examiner.  Keith testified that he found one latent fingerprint suitable for comparison on the exterior duct-taped surface of one of the bricks of cocaine and five such prints on the other brick of cocaine.  Keith determined that the latent fingerprint on the first brick of cocaine was made by defendant's left ring finger.  Keith further determined that one of the five fingerprints found on the other brick of cocaine was made by defendant's left index finger.

After hearing this evidence, as well as the arguments of the parties, the trial court found defendant guilty of the offense of unlawful possession of a controlled substance with intent to deliver  (720 ILCS 570/401(a)(2)(D) (West 2002)), charged in count I of the indictment, on a theory of accountability.  The trial court found defendant not guilty of the offense of armed violence (720 ILCS 5/33A--2(a) (West 2002)), charged in count II of the indictment.  After denying defendant's motion for new trial, the trial court sentenced defendant to 16 years' imprisonment.  Defendant now timely appeals.

II. ANALYSIS

A. Motion to Quash Arrest and Suppress Evidence

In reviewing a trial court's ruling on a motion to suppress, we may reverse the trial court's findings of historical fact only if they are against the manifest weight of the evidence.  
People v. Sorenson
, 196 Ill. 2d 425, 431 (2001).  However, we must review 
de
 
novo
 the ultimate conclusion of the trial court as to the existence of probable cause or reasonable suspicion.  
Sorenson
, 196 Ill. 2d at 431.  In this case, defendant challenges both factual and legal determinations made by the trial court at the hearing on his motion to quash arrest and suppress evidence.

Defendant argues that Detective Weiss decided to stop the red pickup truck on a mere hunch, that Weiss conducted no questioning to dispel his hunch before arresting defendant, and that a mere hunch is legally insufficient to constitute probable cause to arrest.  It is true that something more than a mere hunch or suspicion of criminal activity is required to reach the quantum of suspicion equal to probable cause to arrest (
People v. Little
, 322 Ill. App. 3d 607, 612 (2001)).  "Probable cause to arrest exists where the facts and circumstances known to the police officer at the time of the arrest are sufficient to warrant a person of reasonable caution to believe that an offense had been committed and that the offense was committed by the person arrested."  
People v. Sims
, 192 Ill. 2d 592, 614 (2000).  Although at one point he did agree with defense counsel's suggestion that he had a "hunch" about the red pickup truck's occupants' involvement in the illegal drug transaction, Detective Weiss testified to more than a hunch.  

Detective Weiss testified  that he "felt" and "suspected" that the red pickup truck's occupants were involved in the crime, based on a number of facts known to him through intelligence gathered during the narcotics investigation, through his own observations, and through the observations of other officers performing surveillance of the operation.  First, police intelligence established that Fuentes was traveling to the parking lot in a tan or brown Nissan Maxima with the intention of selling two kilograms of cocaine to Detective Davis.  Detective Davis verified this on the afternoon in question when he spoke to Fuentes by telephone and Fuentes indicated that he was traveling on Lake Street in the Nissan in route to the parking lot at 534 Valerie Lane.  Detective Weiss and other officers observed the Nissan traveling in tandem with the red pickup truck on Lake Street, Addison Road, and Green Meadows Drive before the vehicles turned into the parking lot.  The red pickup truck remained behind the Nissan on three different streets, despite opportunities for the red pickup truck  to overtake the slow-moving Nissan.  Additionally, Detective Weiss testified that, in his experience, large drug transactions like this one often involve countersurveillance to provide security.  A police officer's factual knowledge, based on prior law-enforcement experience, is relevant in determining whether probable cause existed.  
People v. Tisler
, 103 Ill. 2d 226, 237 (1984).  Evidence of countersurveillance of an illegal narcotics transaction may support a finding of probable cause.  
United States v. Soto
, 375 F.3d 1219, 1222 (10th Cir. 2004).   

There was other evidence presented at the hearing on defendant's motion, in addition to the facts and circumstances known to Detective Weiss at the time he arrested defendant.  Specifically, Detective Davis testified that he saw defendant and Moreno look back toward him and the Nissan as he was approaching Fuentes and Cortez.  Although this information was unknown to Detective Weiss at the time he arrested defendant, it was properly considered in the probable cause determination as additional evidence that the occupants of the red pickup truck were working in concert with the occupants of the Nissan.  Where officers are working together in investigating a crime, the knowledge of each constitutes the knowledge of all, and probable cause can be established from all the information collectively received by the officers.  
People v. Franzen
, 251 Ill. App. 3d 813, 827 (1993); 
People v. Fox
, 155 Ill. App. 3d 256, 263-64 (1987).  

Defendant argues that the trial court's factual finding that the occupants of the red pickup truck "looked back at the transaction as it's happening" was against the manifest weight of the evidence because (1) it was improper for the trial court to have characterized this look back as surveillance where there was no testimony establishing the duration of the backward look; and (2) Detective Davis's failure to memorialize the purported backward look on the audio tape of the undercover operation or in his incident report discredits his testimony.  A decision is against the manifest weight of the evidence when the opposite conclusion is clearly evident or where it is unreasonable, arbitrary, or not based on the evidence.  
Maple v. Gustafson
, 151 Ill. 2d 445, 454 (1992).  For the reasons that follow, we do not believe that the trial court's finding with respect to this backward look was against the manifest weight of the evidence. 

The fact that there was no evidence to establish the duration of the backward look does not render the trial court's finding that such an event took place against the manifest weight of the evidence.  Defendant asserts that "the State never elicited evidence as to the duration of this backward-looking action, leaving the possibility that Defendant Ortiz cast nothing more than a fleeting glance in the direction of the Nissan.  Even accepting 
arguendo
 Detective Davis' testimony as true, it was improper in light [of] such scant evidence for the trial court to have characterized this backward look as surveillance."  All of the events in the parking lot on the afternoon in question prior to defendant's arrest occurred in about 1 minute and 45 seconds.  The fact that the duration of the backward look was not established leaves open many 
possibilities
, including the possibility that defendant fixed his eyes on the location of the anticipated drug transaction for an extended period of time.  In any event, when the trial judge, as trier of fact, assessed the evidence in this case, he chose to believe Detective Davis's testimony and concluded that the fact that the occupants of the red pickup truck looked back toward Detective Davis and the Nissan, together with other facts known to the officers, made it more likely that the occupants of the red pickup truck were connected with the occupants of the Nissan and were performing countersurveillance.  In our view, the opposite conclusion is not clearly evident nor is the conclusion unreasonable, arbitrary, or not based on the evidence and, therefore, the trial court's finding is not against the manifest weight of the evidence.

The fact that Detective Davis made no oral recitation of his observation of the backward look into the electronic recording device he was wearing stands to reason under the circumstances and does not discredit Detective Davis's testimony.  Detective Davis was working undercover posing as a drug dealer and was about to approach the targets of his investigation to purchase two kilograms of cocaine, when he saw defendant and Moreno look back toward him and the Nissan.  Making a verbal note of his observation at that point may well have compromised his cover and caused Fuentes and Cortez to become suspicious.  Citing 
People v. Henry
, 47 Ill. 2d 312, 321 (1970), defendant argues that a failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the nonexistence of a fact.  However, in this instance, it simply would not have been natural, or wise, for Detective Davis to verbalize his observation.

As to the absence of a notation regarding his observation of the backward look in his incident report, we conclude that this circumstance does not render the trial court's finding that the men indeed looked back against the manifest weight of the evidence.  A police officer's testimony as to an observation not included in his report of an incident does not necessarily discredit the officer's testimony but, rather, merely raises a question of credibility for the trier of fact.  
People v. Moore
, 341 Ill. App. 3d 804, 812 (2003); 
People v. Weathers
, 18 Ill. App. 3d 338, 343 (1974).  In this case, the trial court resolved this question of credibility adversely to defendant.  "At a hearing on a motion to suppress, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence."  
People v. Ballard
, 206 Ill. 2d 151, 162 (2002).  The trial court's decision to believe Detective Davis's testimony that defendant and Moreno looked toward Detective Davis and the Nissan was not unreasonable, arbitrary, or lacking an evidentiary basis and, therefore, was not against the manifest weight of the evidence.

Based upon these facts and circumstances collectively known to the officers prior to arresting defendant, we conclude that it was reasonable for Detective Weiss to infer a common enterprise among the occupants of the red pickup truck and Fuentes.  Consequently, a reasonable, cautious person in Detective Weiss's shoes would be led to conclude that defendant had committed a crime such that there was probable cause to arrest defendant. 

Next, defendant asserts that the trial court's conclusion that the manner in which the two vehicles were driven established that their occupants, passengers and drivers alike, were working together toward a common goal is tantamount to "probable cause by the carload."   Defendant concludes, citing 
Ybarra v. Illinois
, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), that it was an improper assumption of guilt by association to conclude that defendant was involved just because he was in the red pickup truck.  As such, defendant does not argue that the police lacked probable cause to believe that the red pickup truck's 
driver
 was performing countersurveillance of the drug transaction (
Soto
, 375 F.3d at 1222 (evidence of countersurveillance may support finding of probable cause)) but, rather, argues that defendant's mere presence in the red pickup truck did not give the officers probable cause to believe that 
defendant
 was participating in the performance of countersurveillance for the drug deal.

We have rejected defendant's contention that the trial court's finding that defendant looked back at the drug transaction was against the manifest weight of the evidence.  Accordingly, defendant's backward look, together with the totality of the circumstances, including the tandem driving of the two vehicles and Detective Weiss's prior law-enforcement experience of countersurveillance of large drug deals, established individualized probable cause with respect to defendant.  Thus, the police did have reason to believe that defendant was involved in the crime, and their arrest of him was supported by probable cause.  Hence, defendant's attempt to characterize this as a guilt-by-association case is unavailing.

Our conclusion that the officers had individualized probable cause sufficient to support an arrest of defendant is supported by the United Supreme Court's decision in 
Maryland v. Pringle
, 540 U.S. 366, 157 L. Ed. 2d 769, 124 S. Ct. 795 (2003).  In 
Pringle
, the defendant was the front-seat passenger of a vehicle occupied by three men that was stopped by a police officer for speeding.  
Pringle
, 540 U.S. at ___, 157 L. Ed. 2d at 773, 124 S. Ct. at 798.  A consensual search of the vehicle led to the discovery of cocaine behind the backseat armrest and, after all three occupants denied any knowledge of the cocaine, to the arrest of all three men.  
Pringle
, 540 U.S. at ___, 157 L. Ed. 2d at 774, 124 S. Ct. at 798.  The issue before the United States Supreme Court was whether the police officer had probable cause to believe that the defendant committed a crime.  
Pringle
, 540 U.S. at ___, 157 L. Ed. 2d at 775, 124 S. Ct. at 799.  In rejecting the defendant's attempt to characterize the case as a guilt-by-association case, the Supreme Court wrote:

"In 
Ybarra
, police officers obtained a warrant to search a tavern and its bartender for evidence of possession of a controlled substance.  Upon entering the tavern, the officers conducted patdown searches of the customers present in the tavern, including Ybarra.  Inside a cigarette pack retrieved from Ybarra's pocket, an officer found six tinfoil packets containing heroin.  We stated:

'[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. [Citation.] Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.  This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.'  [
Ybarra
, 444 U.S. at 91, 62 L. Ed. 2d at 245, 100 S. 
Ct. at 342.]

We held that the search warrant did not permit body searches of all of the tavern's patrons and that the police could not pat down the patrons for weapons, absent individualized suspicion.  [
Ybarra
, 444 U.S. at 92, 62 L. Ed. 2d at 246, 100 S. Ct. at 343.]

This case is quite different from 
Ybarra
.  Pringle and his two companions were in a relatively small automobile, not a public tavern.  In 
Wyoming v. Houghton
, 526 U.S. 295[, 143 L. Ed. 2d 408, 119 S. Ct. 1297] (1999), we noted that 'a car passenger--unlike the unwitting tavern patron in 
Ybarra
--will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.'  [
Houghton
, 526 U.S. at 304-05, 143 L. Ed. 2d at 417, 119 S. Ct. at 1302.]  Here we think it was reasonable for the officer to infer a common enterprise among the three men.  The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him."  
Pringle
, 540 U.S. at ___, 157 L. Ed. 2d at 776-77, 124 S. Ct. at 801.

The concept that it is reasonable to infer that co-occupants of a vehicle are engaged in a common enterprise has been recognized by our appellate court.  
People v. Allen
, 268 Ill. App. 3d 279, 284 (1994) ("it is much more likely a car passenger is a companion to the driver, and perhaps involved in the driver's criminal behavior, than the public customer in the tavern in 
Ybarra
.")

Like in 
Pringle
, in this case, it is very unlikely that an innocent, uninvolved person would be invited to ride along with Moreno as he performed countersurveillance security to facilitate the illicit sale of two kilograms of cocaine for $38,000.  Thus, it was reasonable for the officers to infer that both defendant and Moreno were engaged in countersurveillance for this drug deal.

Defendant cites this court's decision in 
People v. Morquecho
, 347 Ill. App. 3d 382 (2004), in support of his contention that there was no individualized suspicion as to him and, therefore, no probable cause for his arrest.  In 
Morquecho
, police officers anticipated an undercover purchase of drugs from a man named Gonzales, from whom an officer had previously purchased drugs. 
Morquecho
, 347 Ill. App. 3d at 384.  Officers expected Gonzales to arrive at a store parking lot with another person, but they did not know who that other person would be.  
Morquecho
, 347 Ill. App. 3d at 384.  Officers observed a black Ford Mustang enter the parking lot.  
Morquecho
, 347 Ill. App. 3d at 384.  Gonzales was driving the Mustang and the defendant was in the passenger seat.  
Morquecho
, 347 Ill. App. 3d at 384.  Officers recognized the Mustang as the defendant's vehicle from two prior police contacts with the defendant.  
Morquecho
, 347 Ill. App. 3d at 384.  Gonzales parked the Mustang 20 feet from an officer's undercover vehicle, entered the vehicle, and delivered cocaine to the undercover officer.  
Morquecho
, 347 Ill. App. 3d at 384.  After a prearranged arrest signal was given, both Gonzales and the defendant were arrested.  
Morquecho
, 347 Ill. App. 3d at 384-85.  The defendant did nothing other than sit in the Mustang.  
Morquecho
, 347 Ill. App. 3d at 385.  A pat-down search of the defendant led to the discovery of narcotics in the defendant's sock.  The defendant was charged with unlawful possession with intent to deliver a substance containing cocaine (720 ILCS 570/401(a)(2)(A) (West 2000)), unlawful delivery of a substance containing cocaine (720 ILCS 570/401(c)(2) (West 2000)), and unlawful possession of a substance containing cocaine (720 ILCS 570/402(a)(2)(A) (West 2000)).  
Morquecho
, 347 Ill. App. 3d at 383-84.  The trial court granted the defendant's motion to quash arrest and suppress evidence, holding that the police lacked probable cause to arrest the defendant.  
Morquecho
, 347 Ill. App. 3d at 385.  On appeal from this ruling, the State
 did not argue that the police had probable cause to arrest the defendant
 but, rather, contended that the officers were permitted to detain the defendant and search him for weapons pursuant to 
Terry v. Ohio
, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968).  
Morquecho
, 347 Ill. App. 3d at 386.  In affirming the trial court's judgment, the majority in 
Morquecho
 held that the police lacked the required 
Terry
 suspicion to pat the defendant down for weapons, and it did not discuss the propriety of the stop.  
Morquecho
, 347 Ill. App. 3d at 386.  Because the issue of whether the State had probable cause to arrest the defendant was not before this court in 
Morquecho
, that case is inapposite to defendant's contention in this appeal.

Defendant points to language in the 
Morquecho
 majority opinion criticizing the dissenting justice's purported conclusion that the police had probable cause to arrest the defendant:  

"The trial court found that there were insufficient facts to establish any basis for a stop, let alone a pat-down search.  The dissent reweighs the evidence and finds that there was probable cause based upon possibilities rather than probabilities.  The dissent determines probable cause existed by transferring to defendant the facts relating to the person who actually committed the sale and delivery of contraband.  Essentially, the dissent determines guilt by association."  
Morquecho
, 347 Il. App. 3d at 387.  

Defendant claims that this criticism constitutes a holding that a passenger cannot be arrested simply because of his proximity in an automobile to an individual independently suspected of criminal activity.  We disagree.  We believe that because the State did not argue that there was probable cause for the defendant's arrest in 
Morquecho
, any references to that issue are  nonbinding 
obiter
 
dicta
, that is, comments in a judicial opinion that are unnecessary to the disposition of the case (
People v. Williams
, 204 Ill. 2d 191, 206 (2003)).  Our decision in 
Morquecho
 may have been different had the issue been squarely placed before this court and had the State cited the Supreme Court's holding in 
Pringle
 in support of a contention that the police had probable cause to arrest the defendant.  For these reasons, we reject defendant's contention that  
Morquecho
 supports his position in this appeal.

Defendant also asserts that, pursuant to this court's decision in 
People v. Woods
, 241 Ill. App. 3d 285 (1993), the police improperly deduced that he was involved in this crime merely because he was present in a pickup truck that was near the narcotics transaction.  We find the facts and circumstances known to the police in 
Woods
 to be distinguishable from the facts and circumstances known to the officers in this case.

  In 
Woods
, the Elgin police department was conducting a narcotics surveillance operation on a known, "very active" drug house at 320 Park Street.  
Woods
, 241 Ill. App. 3d at 287.  The house had four apartments, with a front staircase leading only to an apartment where an individual with prior drug arrests who was associated with two "infamous" drug houses lived.   
Woods
, 241 Ill. App. 3d at 287.  On the night in question, three persons were arrested shortly after entering 320 Park Street and then leaving two minutes later.  Two of these persons entered and left via the front staircase and the other person entered and left a different apartment.  All three were found in possession of cocaine.  
Woods
, 241 Ill. App. 3d at 287-88.  Shortly after these arrests, officers observed the defendant exit the passenger side of a vehicle driven by a woman.  The defendant entered 320 Park Street via the front staircase and emerged from the building two minutes later.  
Woods
, 241 Ill. App. 3d at 288.  The defendant entered the car and drove off.  
Woods
, 241 Ill. App. 3d at 288.  Thereafter, officers stopped the defendant's car, searched him, and discovered cocaine inside the band of his cap.  
Woods
, 241 Ill. App. 3d at 286, 288.  The trial court denied the defendant's motion to suppress, holding that the police had probable cause to arrest the defendant.  
Woods
, 241 Ill. App. 3d at 288.  On appeal, the defendant argued that his mere presence in the house on the evening in question did not give the police probable cause to believe that he was doing anything illegal.  
Woods
, 241 Ill. App. 3d at 288-89.  This court held that the trial court erred in finding that there was probable cause to arrest the defendant because, by their own admission, the police never saw defendant commit any act that appeared to be illegal and their suspicion was based on induction. 
Woods
, 241 Ill. App. 3d at 289.  We noted that there was no evidence that the three people found in possession of cocaine did not possess it before they entered 320 Park Street.   
Woods
, 241 Ill. App. 3d at 289.  We also said:

"At least under the facts of this case, this type of inductive reasoning falls short of established standards for probable cause.  It has been held repeatedly that neither the mere presence at a place where drugs are to be found nor the mere association with people known to be involved with drugs is sufficient to establish probable cause for illegal drug activity. [Citations.]  Here Detective Brictson admitted that he saw defendant do nothing illegal; the officer could not even say whether defendant actually entered the upstairs apartment.  Although the police had some ground for a hunch that defendant was engaged in a drug purchase, they lacked the specific facts needed to establish probable cause.  We conclude that the probable cause finding was legally erroneous."  
Woods
, 241 Ill. App. 3d at 289-90. 

The facts known to the officers who arrested the defendant in 
Woods
 were very different from the facts known to the officers who arrested this defendant.  The pertinent inquiry is whether a reasonable, cautious person, standing in the officer's shoes, would believe that defendant committed a crime.  
Sims
, 192 Ill. 2d at 614.  In 
Woods
, the officers observed nothing that would lead a reasonable, cautious person to believe that the defendant committed a crime, because they only saw the defendant enter a suspected drug house.  This behavior, without more, does not make it probable that the defendant went to that location to engage in criminal conduct.  

The quantum of suspicion with respect to the defendant in 
Woods
 is comparable to the quantum of suspicion the police had with respect to the defendant in 
Ybarra
.  Defendants Woods and Ybarra were both at places where individuals suspected of selling illegal narcotics were located,  Ybarra at the Aurora Tap Tavern, Aurora, and Woods at 320 Park Street, Elgin.  However, such propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause.  
Ybarra
, 444 U.S. at 91, 62 L. Ed. 2d at 245, 100 S. Ct. at 342.  Consequently, a reasonable, cautious person in the shoes of the officers in 
Woods
 and the officers in 
Ybarra
 would not be led to believe that those defendants committed crimes.  

In contrast to the observations made by the police in 
Woods
 and 
Ybarra
, the police in this case did see defendant commit an act that appeared to be illegal, that is, they observed him riding as a passenger in a vehicle that the officers had probable cause to believe was serving as security for an illicit drug transaction.  It is possible that, the backward look aside, defendant was merely present in that vehicle.  However, 
Pringle
 teaches that the choice of co-occupants of a vehicle to travel together in close proximity constitutes the "more" in the familiar holding that "a person's propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person" (
Ybarra
, 444 U.S. at 91, 62 L. Ed. 2d at 245, 100 S. Ct. at 342). 
 
" '[A] car passenger--unlike the unwitting tavern patron in 
Ybarra
--will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.' "  
Pringle
, 540 U.S. at ___, 157 L. Ed. 2d at 777, 124 S. Ct. at 801,
 quoting 
Houghton
, 526 U.S. at 304-05, 143 L. Ed. 2d at 417, 119 S. Ct. at 1302.  Thus, the inference that co-occupants of a vehicle are engaged in a common enterprise is one that a reasonable, cautious person can make in determining whether a person has committed a crime.  The same inference with respect to people inside a public tavern or an apartment building, without more, is not reasonable.  
For these reasons, we reject defendant's assertion that our holding in 
Woods
 dictates a conclusion that the police improperly deduced that he was involved in this crime.

B. Sufficiency of Evidence Presented at Trial

Defendant also contends that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt of knowingly possessing a controlled substance with intent to deliver.  The State argues that defendant has waived this argument because he did not provide an adequate record showing that this issue was raised in his posttrial motion.  

The report of proceedings for November 7, 2003, includes an acknowledgment by the State  that defendant filed a motion for new trial on that date.  Nevertheless, there is no such motion in the common law record.  At sentencing, the trial court denied defendant's motion for new trial without any comment.  Consequently, the State is correct in its observation that the record on appeal precludes us from determining if the insufficiency of the evidence was argued in defendant's posttrial motion.  Even so, we do not believe that defendant has forfeited this argument on appeal.  Generally, in order to preserve an issue for appellate review, a defendant must make a timely objection at trial and include the ground for the objection in a written posttrial motion.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  However, in 
Enoch
, the court held: "when the defendant fails to comply with the statutory requirement to file a post-trial motion, our review will be limited to constitutional issues which have been properly raised at trial and which can be raised later in a postconviction hearing petition [citation], sufficiency of the evidence, and plain error."  
Enoch
, 122 Ill. 2d at 190.  Therefore, as defendant's contention on appeal challenges the sufficiency of the evidence, we will consider it. 

When a defendant contends that the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt, the reviewing court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Evans
, 209 Ill. 2d 194, 209 (2004).  The defendant's conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of his guilt.  
Evans
, 209 Ill. 2d at 209.

Defendant argues that the evidence presented at trial was insufficient to prove that he was in actual or constructive possession of the cocaine.  Defendant fails to realize that the State proved defendant's guilt by accountability and, therefore, did not need to prove that defendant actually or constructively possessed the cocaine with intent to deliver.  Under an accountability theory, the State was required to prove that defendant was accountable for Fuentes's act of possessing the cocaine with  intent to deliver.  Section 5--2 of the Criminal Code of 1961 provides that "[a] person is legally accountable for the conduct of another when *** [e]ither before of during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning of commission of the offense."  720 ILCS 5/5--2 (West 2002).  The evidence presented at trial showed that the Nissan and the red pickup truck traveled in tandem to the site of the drug transaction, indicating that the occupants of both vehicles were engaged in a common enterprise.  Defendant's and Moreno's backward look toward the transaction was a further indication that defendant and Moreno were aware of the men in the Nissan and that they were all working together.  Detective Weiss testified that in his experience, countersurveillance is often utilized by drug dealers to provide security for large drug deals such as this one.  The two loaded handguns recovered from the red pickup truck indicate conduct that is consistent with countersurveillance of an illegal drug transaction.  Finally, defendant's fingerprints on the packages of cocaine indicate his knowledge of the drugs.  Viewed in a light most favorable to the prosecution, the foregoing evidence was sufficient to support a conclusion that defendant had the intent to facilitate this offense by aiding and abetting Fuentes's possession of the cocaine with intent to deliver.  As such, we decline to disturb the trial court's determination that the State proved defendant guilty of that offense beyond a reasonable doubt.

Defendant asserts that his conduct did not permit the inference that he was aware of the cocaine in the Nissan.  We disagree.  The evidence outlined above, viewed in a light most favorable to the prosecution, is clearly sufficient to show that defendant knew about the cocaine and was in fact facilitating its delivery by providing armed security for the men actually delivering the drugs.  Keith's concession that he did not know when or how defendant's fingerprints were made on the bricks of cocaine does not make the inference, based on that evidence, of defendant's knowledge of the cocaine unreasonable, improbable, or unsatisfactory.

Finally, defendant cites authority for the proposition that the mere presence of a defendant at the scene of a crime, even when he knows that a crime is being committed, is insufficient, without more, to establish accountability (
People v. Batchelor
, 171 Ill. 2d 367, 375-76 (1996)).  As we have noted above, however, the State has proven more than defendant's mere presence.

III.  CONCLUSION

For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.  

      O'MALLEY, P.J., and GILLERAN JOHNSON, J., concur.

FOOTNOTES
1:
The transcripts of the hearing on defendant's motion spell this man's last name"Fuentes" but he was indicted as "Enrique Puente."