# Illinois Official Reports

## Appellate Court

---

### *People v. Hernandez*, 2017 IL App (2d) 150731

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, .v JOSE L. HERNANDEZ, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-0731 |
| Filed | January 25, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 14-CF-1268; the Hon. John J. Kinsella, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Richard J. Dvorak and Christopher A. Tinsley, of Dvorak Law Offices, LLC, of Willowbrook, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman and Mary A. Fleming, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Burke and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a bench trial, defendant, Jose L. Hernandez, was convicted of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(1)(D) (West 2014)). He appeals, contending that the State failed to prove beyond a reasonable doubt that he knowingly participated in the transaction. We affirm.

¶ 2      At trial, Garrick Amschl testified that he was a detective with the Olympia Fields police department, assigned to the Department of Homeland Security. In this capacity, he investigated major crimes involving narcotics and money laundering. In his career, he had participated in hundreds of cases.

¶ 3      Virtually all of Amschl's cases involved surveillance. He explained that narcotics traffickers and money launderers often conduct "heat runs" and other countersurveillance techniques to find out if they are being watched by law enforcement. A heat run involves taking an out-of-the-way route to an actual destination. Such a run might involve numerous turns, pulling to the side of the street, making U-turns, going down back alleys, or going the wrong way on a one-way street to see if someone is following. This is merely a list of possible behaviors to look for; not every technique will be involved in every investigation.

¶ 4      On July 24, 2014, Amschl learned that a previous target of an investigation had been stopped in Arkansas with more than $100,000 on his person. The vehicle in which he was riding was registered to 14 Lynch Street in Elgin. Amschl went to 14 Lynch Street at about 10 a.m. with detectives Miguel Pantoja and Juan Carrillo. They parked on the street, just north of the address. They saw a black Chevrolet Cruze that was registered to defendant at an address in Texas.

¶ 5      The officers saw a woman and a young boy leave the house and drive off in a different car. They followed them to a local restaurant, where the woman and the child ate breakfast. When they returned to 14 Lynch Street, the Chevrolet Cruze had left. That vehicle returned at about 1:20 p.m., occupied by two Hispanic men, defendant driving. Defendant left the vehicle and entered the house empty-handed.

¶ 6      Defendant and the other man returned to the car at around 2:45 p.m. Amschl and the other detectives followed them. Amschl testified that defendant took a circuitous route and made several U-turns, which Amschl opined was consistent with a heat run. However, defendant did not appear to violate any traffic laws. The two men eventually returned to the area of 14 Lynch Street but parked about a block away although there was ample parking available in front of the residence. Amschl testified that, in his experience, narcotics dealers often park away from their residences to obfuscate their exact addresses.

¶ 7      At 4:11 p.m., defendant and the other man returned to the Cruze. The detectives followed them to a condominium complex on Elgin's west side. The detectives did not follow the Cruze into the complex because they did not want to alert defendant and his companion to their presence. About a half-hour later, the Cruze left the parking lot. Defendant was still driving, but now he was alone. His former passenger followed in a Chevrolet Impala, accompanied by another man.

¶ 8      The two cars drove for some time, eventually arriving at a Wal-Mart in Addison. The vehicles then separated and entered the parking lot at different entrances. Amschl lost sight of defendant's vehicle but maintained surveillance of the Impala. He was informed that another

Hispanic man got into the Impala in the parking lot, and he subsequently saw that man get out of the car and get into a red Hyundai. The man was carrying a black bag.

¶ 9   Amschl testified, based on his experience in doing surveillance, that drug dealers often use lookouts. They would generally be positioned so that they could watch for police and intervene if any officers were spotted.

¶ 10   Amschl and Jose Gonzalez, of the Addison police department, executed a traffic stop of the red Hyundai. The driver of the vehicle was Orlando Pacheco-Ramos. A search recovered eight bricks of heroin from the black bag that he had retrieved from the Impala in the Wal-Mart parking lot.

¶ 11   Gonzalez testified that Amschl had requested his assistance in conducting a drug surveillance. He observed the Cruze closely following the Impala. He opined that the Cruze following the Impala was consistent with a drug operation and was intended to prevent the Impala from being pulled over.

¶ 12   Gonzalez saw the two vehicles rendezvous in the Wal-Mart parking lot. The Impala then parked about 20 feet away from the Cruze, within its occupants' line of sight. Nothing blocked the view between the Impala and the Cruze. The Cruze was parked so that defendant could not have seen the Impala without looking in a mirror or turning his body around completely. Gonzalez saw a man approach and get into the Impala's back seat. The front passenger of the Impala got out and retrieved a bag from the trunk, which he deposited into the back seat. The Impala then drove to another part of the parking lot. Gonzalez could not say whether defendant observed the transaction. Gonzalez later learned that the two occupants of the Impala were Andrew Hernandez, defendant's brother, and Luis Hernandez, his father.

¶ 13   Gonzalez testified that, to his knowledge, each of the four men arrested in connection with this case possessed two cell phones. He analyzed the contents of several of the phones he recovered. He could not specifically recall which phones he analyzed, and he did not request location data for any of them. His analysis did not show that defendant had called or texted any of the occupants of the Impala.

¶ 14   Carrillo's testimony was largely consistent with Amschl's. He further testified that he began to follow the Cruze again after it left the Wal-Mart parking lot. The Cruze again fell into line behind the Impala. The two vehicles traveled to Los Comales restaurant in Hanover Park, and the occupants got out and went into the restaurant. They eventually returned to their cars, with the passenger of the Impala getting into the Cruze. As Carrillo resumed following the Cruze, he learned that a traffic stop of another vehicle that had left the Wal-Mart parking lot had led to the seizure of seven kilograms of heroin. Carrillo conducted a stop of the Cruze after it returned to 14 Lynch Street, and he arrested defendant.

¶ 15   Marshal Kite, a canine handler with the Elgin police department, testified that he conducted a canine search of the Cruze. His dog alerted inside the vehicle on the front passenger side below the dashboard toward the center console. Kite identified a photograph that depicted the area on which the dog alerted. In response to defense counsel's objection, the court ruled that the dog's alert did not indicate the presence of any substance and would not be considered for that purpose.

¶ 16   Ron Hain of the Kane County sheriff's department testified that he assisted with the search of the Cruze. He discovered an aftermarket hidden compartment in the area on which Kite's dog alerted. Hain testified that there had been several alterations made to the vehicle in order to

make the hidden compartment. Hain said that the automobile manufacturer would not make a compartment like that. Hain identified photographs depicting the hidden compartment. On cross-examination Hain testified that, the way the compartment was situated, it would not be obvious, even to police officers. Although he did not use a tape measure, Hain estimated that the hidden compartment was about 24 to 36 inches wide and about 12 inches deep. Behind the displays on the driver's side, he estimated the hidden area to be 24 inches wide by 12 inches deep. Hain acknowledged that hidden compartments could be used to hide many things, not just drugs.

¶ 17    The trial court found defendant guilty. The court noted that it was undisputed that a drug transaction occurred, the only question being whether defendant knowingly participated in it or was merely present. The court then extensively recounted the evidence and concluded that defendant was a knowing participant. Had the evidence of the drug delivery itself been the only evidence, the court stated, it might well have been insufficient to prove that defendant knowingly participated. However, the State presented extensive evidence of the events preceding it. The court referred to evidence of the heat run, noting that there was

> "inexplicable stopping, pulling over, pulling forward, turning around, coming back, going north of the home, going south of the home, crossing the river in Elgin on the one side only to then turn around and come back, and then to park the vehicle with no apparent reason other than to somehow disconnect the vehicle from the address by parking down the street and around the corner. *** All of which leads to the conclusion that the defendant knew that he needed to know if he was under surveillance or [if] that vehicle was under surveillance. It's the only viable explanation, the only reasonable inference to be drawn from that. Rather this is not like you drove around the corner and re parked [*sic*] the car. He drove a considerable distance over a considerable period of time looking for any law enforcement surveillance."

¶ 18    The court then recounted the evidence that defendant drove to a condominium complex in Elgin and that his car emerged in tandem with another car containing defendant's father and brother. The court found it significant that the other two men were defendant's close relatives, rather than "two individuals who may or may not have some connection to him."

¶ 19    After reiterating the evidence of the vehicles' trip from Elgin to Addison and their positioning in the Wal-Mart parking lot, the court stated:

> "So the question is, does all of that evidence show that defendant was merely present and in some sort of coincidental fashion with his father and his brother doing the seven kilogram transaction, and that he did not know, and did not attempt to aid or abet them in the commission of this offense, and that he was merely as was suggested on his way to join them for a meal and this was done along the way.
>
>     *** There is no innocent explanation for why the three would be traveling from Elgin to the restaurant[ ] in two separate cars. There's no innocent explanation why he would position his car[ ] the way he did in relation to the transaction, the reasonable inferences and positions of his vehicle so as to act as the lookout, to look out for any potential problems. The evidence was that each of the three individuals, the father, the brother and the defendant all had two cell phones and likely could communicate in regard to the use of any of those cell phones."

¶ 20 The court thus found defendant guilty. Following a hearing, the court sentenced defendant to 20 years' imprisonment. It imposed various fines and fees, by far the largest of which was a $1.4 million street-value fine. Defendant timely appeals.

¶ 21 Defendant contends that the State did not prove him guilty beyond a reasonable doubt of knowingly participating in the drug transaction. When a defendant argues that the evidence was insufficient to sustain his or her conviction, we ask whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, we will not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the fact finder's function to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000); *People v. Washington*, 375 Ill. App. 3d 1012, 1025 (2007).

¶ 22 Defendant was tried on the theory that he was accountable for the actions of his father and brother. A defendant may be found guilty on an accountability theory if the State establishes beyond a reasonable doubt that the defendant shared the criminal intent of the principal or that there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). A defendant's intent may be inferred from the nature of his or her actions and the circumstances surrounding the criminal conduct. *Id.* Words of agreement are not necessary to establish a common purpose to commit a crime, and accountability may be established through a defendant's knowledge of and participation in the criminal scheme, even though there is no evidence that he or she directly participated in the criminal act itself. *Id.* at 267.

¶ 23 Evidence that a defendant was present at the scene, fled the scene, maintained a close affiliation with his or her companions after the crime, and failed to report the crime may be considered in determining the defendant's legal accountability. *Washington*, 375 Ill. App. 3d at 1030. However, mere presence at the scene of a crime, even when joined with flight from the scene or knowledge of the crime, is insufficient to establish accountability. *Id.* "Accountability focuses on the degree of culpability of the offender and seeks to deter persons from *intentionally* aiding or encouraging the commission of offenses." (Emphasis in original.) *Perez*, 189 Ill. 2d at 268. "Thus, '[u]nless the accomplice *intends* to aid the commission of a crime, no guilt will attach.' (Emphasis in original.)" *Id.* (quoting *People v. Shaw*, 186 Ill. 2d 301, 322 (1998)).

¶ 24 Here, the evidence sufficiently proved that defendant served as a lookout while his father and brother conducted a drug transaction. Amschl described how defendant conducted a heat run, driving a circuitous route around Elgin with no apparent destination in mind. Participating in a heat run has been recognized as an important piece of evidence that a defendant was knowingly involved in a drug transaction. See *United States v. Tenorio*, 360 F.3d 491, 495 (5th Cir. 2004) (evidence established that defendant knowingly abetted a drug transaction, including evidence that she engaged in a heat run designed to counteract potential law enforcement surveillance); *United States v. Broussard*, 80 F.3d 1025, 1032-33 (5th Cir. 1996) (evidence that defendant was present during heat runs, passed along coded messages to her husband, and associated with other conspirators supported her conviction of drug conspiracy). The trial court here likewise found such evidence significant and discounted any innocent explanation for defendant's conduct.

¶ 25     Additional evidence showed that, when defendant returned from the heat run, he parked more than a block away from the house, although parking was available closer to the house. Several hours later, he left the house with another man and drove to a condominium complex in Elgin. Three men left the complex in two cars and drove in tandem, in a circuitous route, to a Wal-Mart parking lot. The cars parked several spaces from each other, with defendant parking in a spot where he could see anyone approaching. The men in the other car were met by another man. They gave him a black bag that later proved to contain heroin. Afterward, the three men again drove in tandem to a restaurant. As the trial court observed, it is difficult to imagine any legitimate purpose for such activity. Had they merely been running an innocent errand, there was no need to drive in two separate cars from Elgin to a Wal-Mart in Addison, park in the parking lot without ever entering the store, and then drive back toward Elgin to a restaurant in Hanover Park.

¶ 26     Additional evidence showed that defendant possessed two cell phones. Moreover, the car he was driving contained a hidden compartment that could have been used for hiding drugs. All of these factors point to defendant's knowing participation in the drug delivery and render extremely unlikely any innocent explanation for his conduct. See *People v. McDonald*, 168 Ill. 2d 420, 447 (1995) ("the trier of fact is not required to disregard inferences that flow from the evidence, nor is it required to search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt").

¶ 27     The court further found it significant that the other two men involved in the transaction were defendant's father and brother. Indeed, it is highly unlikely that two of defendant's close relatives engaged in a transaction involving drugs worth more than $1 million while defendant, who was in close proximity to them the entire time, was completely uninvolved.

¶ 28     Defendant cites *People v. Rodriguez-Chavez*, 405 Ill. App. 3d 872 (2010), in support of his contention that the evidence here was insufficient. There, an undercover agent and an informant arranged to purchase a large amount of cocaine in Addison from Brandy Majares and Jose Montez. While that meeting was taking place, agents conducting surveillance of Montez's residence saw the defendants drive up in a minivan. The defendants opened the garage and began halfheartedly raking in the yard. Majares and Montez arrived at the residence, and a short time later, the four men left in two separate vehicles. They drove in tandem about a car-length apart until agents stopped the vehicles several miles from the delivery point. *Id.* at 873-74.

¶ 29     The trial court granted the defendants' motion to quash their arrests and suppress evidence, but this court reversed. We held that the circumstances provided probable cause to believe that the defendants were engaged in a drug transaction. We noted that "[t]he most obvious explanation for all these circumstances is that defendants were in cahoots with Majares and Montez. A reasonably prudent person with knowledge of these circumstances would conclude that defendants had come to Montez's home not to do yard work, but to assist Majares and Montez with the consummation of the sale of a significant quantity of cocaine." *Id.* at 875.

¶ 30     After rejecting one defendant's argument that the circumstances were consistent with innocent activity, we stated, "The argument might be persuasive if probable cause were the equivalent of proof beyond a reasonable doubt." *Id.* at 876. Defendant seizes on this statement to argue that the similar evidence here did not rise to the level of proof beyond a reasonable doubt. We disagree.

¶ 31    Initially, we note that the statement defendant cites is *obiter dictum*. *Obiter dictum* is a remark or opinion that a court uttered as an aside "and is generally not binding authority or precedent within the *stare decisis* rule." *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 236 (2010). When we made the statement in *Rodriguez-Chavez*, we clearly were not attempting to make a binding decision on the facts of some hypothetical future case. Even in the context of that case, the statement was phrased in terms of speculation: "The argument *might* be persuasive." (Emphasis added.) *Rodriguez-Chavez*, 405 Ill. App. 3d at 876.

¶ 32    Moreover, the evidence here was in some ways stronger than the evidence in *Rodriguez-Chavez*. There, the relationship of the defendants to Majares and Mendez was unknown. Here, the codefendants were defendant's father and brother. More importantly, while the defendants in *Rodriguez-Chavez* were stopped before the transaction took place, the detectives here actually witnessed a drug delivery, during which defendant was in a position to act as a lookout.

¶ 33    Defendant also cites *People v. Ortiz*, 355 Ill. App. 3d 1056 (2005). There, we rejected the defendant's contention that the evidence was insufficient. The evidence showed that the defendant was in one of two vehicles that drove in tandem to an arranged drug buy. We held that the evidence was sufficient to prove that the defendant was providing security for the delivery. *Id.* at 1074. Defendant here acknowledges this holding, but he argues that additional evidence, not present here, supported the finding, such as the discovery of guns in the defendant's vehicle and the presence of the defendant's fingerprints on the packages of cocaine.

¶ 34    We agree that in *Ortiz* we noted the additional evidence that the defendant's pickup truck concealed two loaded handguns and that the defendant's fingerprints were recovered from the packages of cocaine. However, we also stated that the evidence "showed that the Nissan and the red pickup truck traveled in tandem to the site of the drug transaction, indicating that the occupants of both vehicles were engaged in a common enterprise." *Id.*

¶ 35    In this case, the detectives' surveillance was more extensive than that in *Ortiz*. The detectives observed defendant from when he left the residence until he was arrested, and they also observed the heat run. This additional evidence strengthened the inference that defendant was intimately involved in the drug transaction.

¶ 36    Finally, defendant analyzes individual items of evidence and suggests that they were subject to innocent interpretations. Defendant first considers Amschl's testimony that defendant engaged in a heat run. He argues that Amschl did not observe many of the elements one would expect to find during a heat run, such as erratic driving. However, Amschl testified that the driving maneuvers he described were merely a list of possible behaviors to look for and that not every technique will be involved in every investigation. Defendant argues that the actions Amschl did observe were consistent with someone being lost or pulling over to use a cell phone. However, defendant, after driving a circuitous route, apparently returned to the residence without seeking an actual destination. Thus, the trial court was entitled to credit Amschl's opinion that this was a heat run.

¶ 37    Defendant further argues that his actions in driving to the condominium complex were more consistent with merely running an errand than with participating in a drug deal, given that he did not switch cars in the parking lot or otherwise evade detection. We agree with the trial court, however, that the actions of driving two cars to a Wal-Mart in a distant town and parking

the cars in nearby spaces, but not directly next to each other, without any occupant ever entering the store, are not consistent with merely running an errand.

¶ 38   Defendant then argues that his actions in the parking lot were not consistent with acting as a lookout for a drug deal. He notes that he did not engage with his codefendants in any meaningful way and that his car was positioned such that he likely could not have seen the transaction. However, as the State notes, the point of being a lookout is to watch for signs of law enforcement, not to monitor the transaction.

¶ 39   Finally, the fact that no physical evidence directly tied defendant to the drug transaction is not fatal. The detectives' testimony regarding defendant's actions was sufficient to establish his knowledge of, and participation in, the transaction. See *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23 (absence of physical evidence is not in itself a reason for reversal, since a single eyewitness identification can sustain a conviction); *People v. Gomez*, 215 Ill. App. 3d 208, 216 (1991) ("Circumstantial evidence is sufficient to sustain a conviction if it satisfies proof beyond a reasonable doubt of the elements of the crime charged.").

¶ 40   The judgment of the circuit court of Du Page County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 41   Affirmed.