NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240364-U

NO. 4-24-0364

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 1, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Stephenson County |
| ARIEAN K. COLLINS, | ) | No. 20CF9 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Glenn R. Schorsch, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed and remanded for a new trial, finding (1) defendant showed ineffective assistance of counsel when counsel failed to (a) file a motion to suppress statements and (b) object to a detective's opinion regarding defendant's credibility and (2) the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, allowing for a retrial.

¶ 2    In November 2022, a jury convicted defendant, Ariean K. Collins, of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2018)), two counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(1), (2) (West 2018)), aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1)(3)(I) (West 2018)), and aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2018)), in connection with the December 9, 2019, shooting of Darrin McCurty. Defendant was tried and convicted under a theory of accountability.

¶ 3    Defendant appeals, contending (1) counsel rendered ineffective assistance by failing to (a)  move to suppress statements defendant made to police detectives after defendant

told them he did not feel like talking anymore and (b) object to a detective's opinion testimony that defendant was lying and allowing the detective to give an opinion regarding the ultimate issue in the case, (2) the trial court erred in failing to suppress evidence of a Snapchat video showing him holding guns and a Google search inquiring how to modify a gun, (3) the court erred in allowing the State to present evidence of his prior conviction for unlawful use of a weapon, and (4) the State failed to prove him guilty beyond a reasonable doubt.

¶ 4 We conclude defendant showed ineffective assistance of counsel based on counsel's failure to move to suppress statements defendant made to detectives after they violated his right to remain silent and failure to object to a detective's opinion testimony regarding defendant's credibility and the ultimate issue in the case. However, we find the evidence sufficient to convict defendant beyond a reasonable doubt. Accordingly, we reverse and remand for a new trial. In anticipation of the other issues defendant raises on appeal arising again during his retrial, we address them and find no error.

¶ 5                                         I. BACKGROUND

¶ 6 In January 2020 and October 2022, the State charged defendant with attempted first degree murder, two counts of aggravated discharge of a firearm, aggravated unlawful use of a weapon, and aggravated battery with a firearm in connection with the December 9, 2019, shooting of McCurty at his apartment in Freeport, Illinois. Defendant was at the scene of the shooting with his friends, Darion Wheeler and Marcus Price, but he denied knowing of any plan to rob McCurty. Defendant was tried under a theory of accountability.

¶ 7                                        A. Pretrial Motions

¶ 8 Before trial, the State moved to introduce videos from defendant's Snapchat account showing him wearing a blue sweatshirt and holding two guns, one of which was a two-

toned gun that matched a description of the weapon used in the crime by McCurty's wife, Consuella Bond. The State noted .45-caliber cartridge cases were found at the crime scene and, while the caliber of the weapons in the video was not definitively known, they were large caliber weapons and larger than .22-caliber. The videos were made 65 minutes before McCurty's shooting was reported. The State alleged defendant had indicated in a January 2020 interview with police detectives that he wore a blue sweatshirt on the day of the shooting and his Snapchat videos would show him with a "big a*** silver gun" and "the big a** gun used to smoke someone." Defendant told detectives the videos were made in Wheeler's basement. Defendant had admitted he was present at the shooting but blamed Wheeler for it.

¶ 9        Defense counsel objected to the videos, arguing they were irrelevant and unduly prejudicial. The trial court allowed the evidence over defense counsel's objection. The court noted the videos were relevant to prove the unlawful use of a weapon charge and in proving defendant's accountability on the attempted murder charge.

¶ 10        The State also moved to admit, for purposes of impeachment, a prior conviction for unlawful use of a weapon that occurred while defendant was on bond, should defendant choose to testify. Defense counsel objected, arguing the prior conviction was more prejudicial than probative because defendant was currently charged with a firearm offense, and the State was seeking to introduce evidence of another firearm offense. The trial court found the evidence more probative than prejudicial and stated it would allow the evidence, should defendant choose to testify.

¶ 11                                B. Trial

¶ 12        In October 2022, a jury trial was held. McCurty testified he lived at an apartment in Freeport, Illinois, with his wife, Consuella, and her three children, Deondre, Desiree, and

- 3 -

Donell, at the time of the shooting. McCurty did not remember anything from December 9, 2019, or for eight months after the shooting. He suffered extensive injuries and testified about the negative impact the shooting had on his life.

¶ 13 Deondre testified his friend and neighbor, James Pulliam, came over often and used Deondre's tablets, phones, and computers. Deondre knew Pulliam used cannabis but did not know if he sold it. Pulliam made two videos in Deondre's living room, using Deondre's tablet, of himself with fake money McCurty used as props in music videos. One of the videos showed fake $100 dollar bills that looked real. Pulliam made the videos while sitting on the couch in the living room and posted the videos to Snapchat. Deondre identified a photograph of the living room taken on December 9, 2019, that showed fake money sitting on a glass table in front of the couch.

¶ 14 On December 9, 2019, Deondre performed household chores and went upstairs to his mother's room. His sisters were also upstairs. He then heard a loud bang from downstairs. Deondre thought the glass table in the living room had broken, and Consuella asked him to go downstairs and check it out. As Deondre was coming down the stairs, Pulliam ran up and went into Desiree's room. Deondre asked Pulliam "what was going on," but Pulliam did not respond and bolted past him.

¶ 15 Deondre saw someone unlock and run out the back door. He described the person as light-skinned, with curly hair and a "starter stash," and wearing a dark-colored hoodie. Deondre saw the person's face for "a good couple seconds" and testified he had not seen the person before. Deondre identified defendant in the courtroom as the person he saw run out the back door.

¶ 16 Deondre testified he went outside to follow defendant, but then McCurty opened

the door and said someone was shooting. Deondre testified, "[N]next thing I know someone sneaks up behind us." McCurty struggled with the person, who pointed a large two-toned silver and black gun at McCurty's head and shot him several times. The person then ran away. The police and an ambulance arrived, and McCurty was transported to the hospital. The parties stipulated McCurty sustained gunshot wounds to his head, left wrist, and left thigh.

¶ 17      Pulliam was detained and taken to the police station and interviewed. After the interview, a photo lineup was made and shown to Deondre. Deondre identified defendant in the lineup as the person who ran out the back door before McCurty was shot.

¶ 18      Desiree testified she witnessed the struggle with the shooter. Desiree testified she had previously heard the phrase "hit a lick." When asked what that meant, she said, "They usually just robbed somebody, or they just got up on some good money on somebody." She clarified that meant "they took it from them." On December 9, 2019, Desiree heard the loud bang from downstairs and saw a person run through the hallway, moving their head around like they were looking for someone or something. Desiree saw the person struggle with McCurty and shoot him. She said, aside from the initial loud bang, during the incident, she heard a group of four gunshots and three other gunshots when McCurty was shot. When asked if she saw a gun, she said, "Kind of, yeah." Desiree then stated, "I just seen a silver gun when—I just—I seen it being pulled out. I seen silver, that's all I could see." After the shooting, Desiree ran back upstairs and called 911.

¶ 19      Consuella testified she saw Pulliam run up the stairs during the incident, with someone running behind him, but that person stopped when he saw her. Consuella described the person as light-skinned and carrying a two-toned gun, which was chrome on top and black on the bottom. She identified a photo of a gun as appearing to be like the one the man had. The photo

appeared to be a still image from one of the Snapchat videos portraying defendant holding the gun that was cropped to just show the gun. Consuella testified the man struggled with McCurty, shot him three or four times, and then ran off.

¶ 20 Jeff Thew, a crime scene investigator with the Illinois State Police, found no fingerprints suitable for comparison on the doorknobs to the apartment. Fake money was found on the living room table. Cartridge cases and projectiles were recovered, including .45-caliber cartridge cases. A firearm was never recovered.

¶ 21 Jacob Maratos, a detective with the Freeport Police Department, testified the term "hit a lick" was a common slang term typically used to indicate robbing somebody. Maratos obtained a warrant for defendant's Snapchat and Facebook accounts. Multiple videos from defendant's Snapchat account showing him holding two guns were entered into evidence over defense counsel's objection. One of the guns had markings similar to a Smith & Wesson M&P 9-millimeter Shield pistol. The other was a black and silver two-toned gun. The silver portion was on top and the black portion was on the bottom. Maratos opined the guns were real. Wheeler and Price also appeared in the videos. The videos were uploaded to Snapchat on the evening of the shooting at around 9:28 p.m., 10:20 p.m., and 12:20 a.m. The shooting occurred at approximately 1:24 a.m.

¶ 22 Maratos identified defendant as the person holding the guns in the videos based on defendant's numerous prior contacts with the police. The trial court sustained defense counsel's objection and told the jury the answer was stricken, and they were not to consider it. Maratos then testified he recognized defendant because he had met him before. Defendant was wearing a blue sweatshirt in the videos and generally matched Deondre's description of the person who ran out the back door being light-skinned, with curly hair and a "starter stash."

¶ 23　　　　　Maratos also testified defendant performed a Google search on "how to get an auto switch for a Smith & Wesson M[&]P" a few hours before the shooting. He testified an auto switch would allow a person to hold the trigger down to fire multiple rounds. Defense counsel did not object. Maratos also said he would not be likely to search for a feature to add to a gun he did not own.

¶ 24　　　　　Maratos obtained surveillance video of the area around the crime scene. Before the shooting, three people were seen in the video approaching the door of the apartment. Maratos identified the three people as defendant, Wheeler, and Price. Shortly after, three people ran away at different times and in different directions. Maratos testified he believed they ran off after McCurty was shot, but he could not identify any of them individually.

¶ 25　　　　　Tony Bradbury, a detective with the Freeport Police Department, also identified defendant, Wheeler, and Price in the surveillance video. He also testified "hit a lick" was a fairly common slang term that referred to a theft, robbery, or burglary. Bradbury testified Pulliam gave the police defendant's name, and he was aware Deondre had identified defendant in a photo lineup.

¶ 26　　　　　On December 12, 2019, Bradbury and Maratos interviewed defendant at the county jail after defendant was arrested on another charge. The interview was recorded, and portions of the video were played for the jury. The record refers to times the video was started but does not always make clear when the video was stopped.

¶ 27　　　　　Bradbury read *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436, 471 (1966)) to defendant, and defendant agreed to speak with him. Defendant denied being at the crime scene the night of December 9, 2019, and said he was home. Bradbury told defendant he had a person who had said defendant was invited over that night to smoke cannabis, but when he

showed up, something bad happened. He showed defendant where cameras were located around the crime scene and explained that phone GPS data would probably show defendant was not at home that night. After Bradbury explained further how such evidence was collected, he asked defendant if he agreed all of the evidence would make him look bad. At approximately 18 to 19 minutes into the interview, defendant agreed it would make him look bad and said he would like to see the evidence. Bradbury responded he first had to go through certain steps, and the following colloquy occurred. (Some words in the colloquy are not entirely discernible from the video. Notes about those words and defendant's mannerisms and vocal inflections are included in brackets.)

"DEFENDANT: I don't know what happened.

BRADBURY: OK, well I'm telling you that there's gonna to be a lot of evidence that shows that you were there when something happened.

DEFENDANT: And I would like to see a lot of evidence then.

BRADBURY: I would like to show it to you but like I told you I gotta go through the steps, I have to be able to establish—

DEFENDANT: (interrupting and pointing at the table) are you going to be able to show me right now today?

BRADBURY: I have some stuff with me I'd like to show you.

DEFENDANT: I would like to see those today then [inaudible] I, um, I don't feel like talking about anything [inaudible].

BRADBURY: Ok, well, I can't make you talk to me, Ok. Nobody's forcing you to talk to me right now. I explained your rights to you, and then I'm trying to talk to you about what happened."

Bradbury then told defendant about the amount of evidence against him and described a similar case where an accused who did not cooperate with the police was convicted when he was present during a robbery. Defendant continued to deny his involvement in the crime.

¶ 28 At about 22 minutes into the interview, Bradbury showed defendant the photo lineup and told defendant he was identified as being at the crime scene and also discussed further evidence against him. At approximately 28 minutes into the interview, defendant again noted Bradbury had not shown him the evidence.

¶ 29 Bradbury spoke of how it could look bad for defendant to not tell the truth to the police. Then, at approximately 30 minutes into the interview, Bradbury asked several questions that defendant did not answer. Instead, defendant sat silent, looking away from the detectives. At approximately the 31:30-minute mark, Bradbury told defendant he was going to look like a liar in his report to the trial court, and defendant responded he could "beat it." Bradbury told defendant, "They're saying you did it, too." Defendant responded, "That's what they're saying," and while difficult to hear, he appeared to add, "It didn't happen." Bradbury again asked defendant to tell him what happened. Defendant then said, "Look, I don't feel like talking right now." Bradbury told defendant he did not have to talk and said, "[B]ut I want to talk to you," and he said he had other things he wanted to show defendant. The record indicates the video was stopped after defendant said he could "beat it," but it is not clear if it was stopped before he clarified anything regarding that statement or said he did not feel like talking. The State then advanced the video to the 40:35 time stamp.

¶ 30 When the video was restarted, defendant continued to deny his involvement in the crime. He told Bradbury he was home that night, but his phone GPS would show he was on Shawnee Street because he left it there. Bradbury continued to ask defendant to tell him the truth,

and defendant asked if he could call his mother. Bradbury initially told defendant he was not the person who could allow a phone call and indicated he would not allow that until they were finished with the interview. Defendant said he did not feel comfortable talking to them until he talked to his mother. Bradbury then stopped the interview to see if the jail would allow defendant to make a phone call. Before stopping the interview, defendant verified Bradbury had read his *Miranda* rights to him and he understood them. When defendant returned, he said he could not reach his mother. He continued to deny being involved in the shooting. Defense counsel did not object to the video being played to the jury or to defendant's statements being used.

¶ 31    Bradbury testified defendant's phone call was recorded and he spoke to a male. During the call, defendant said detectives were asking him about "that thing," and the man told defendant not to say anything or answer any more questions.

¶ 32    The State asked Bradbury "Do you think the defendant was telling you the truth during this interview?" Bradbury replied, "Absolutely not." When asked why, Bradbury said he knew there was a statement from someone who said defendant was invited to the apartment, and he had been picked from a photo lineup as a person who was at the apartment. He added, "And then as the investigation went on, there was just so much more information that came to show that he was the person that was there." Defense counsel did not object.

¶ 33    Bradbury interviewed defendant again on January 8, 2020. The interview was recorded and played for the jury. In the interview, defendant admitted being at the crime scene but said he was only there to buy cannabis from Pulliam. Defendant stated Pulliam texted him while he was at Wheeler's house and said he had cannabis for sale. Price, who was also there, went to McCurty's apartment and made a purchase. When Price returned, he said he had smoked all of the cannabis but reported Pulliam was selling an ounce of it for $180, which was a good

price.

¶ 34　　　　Defendant told Bradbury he viewed a video Pulliam had posted earlier that night of himself holding what appeared to be multiple one-hundred dollar bills that could be thousands of dollars in total. However, defendant said there was no intention to rob anyone at the apartment. Instead, they just intended to buy cannabis for a good price, which defendant characterized as "hitting a lick." Defendant agreed with Bradbury that Pulliam was "soft," meaning easily fooled.

¶ 35　　　　Defendant communicated with Pulliam over Snapchat to make the purchase. Defendant told Bradbury he was not armed and did not know that Wheeler had the big two-toned gun when they left to buy the cannabis. However, he also admitted he knew either Wheeler or Price had the 9-millimeter handgun. Defendant stated he had played around with a gun in Wheeler's basement earlier that night.

¶ 36　　　　Price's cousin drove the three men to the area of McCurty's apartment. When they arrived, they parked in a parking lot for other nearby apartments, which required them to walk through the woods to get to the apartment. Bradbury testified the path from the nearby apartments to the crime scene was unmaintained, with a lot of debris and trash, and it crossed a creek. Defendant told Bradbury they parked there because there was a warrant out for Wheeler's arrest and Wheeler wanted to avoid the police. However, he also said he had a "hinky" feeling about things. As they approached the door to the apartment, Wheeler looked in a window and confirmed it was the right apartment.

¶ 37　　　　Defendant said Wheeler and Price sent him to knock on the door while they waited outside. Pulliam answered the door, with another man standing behind him. After Pulliam started to close the door, defendant told him to wait for the other two to follow him. Defendant

told Bradbury he then saw a man push through the doorway and he knew it was Wheeler because he was holding the gun he kept in his house. The man who had been behind Pulliam tried to push the door shut and punched Wheeler, and Wheeler fired a shot. Defendant saw two men coming down the stairs, and he ran out the back door toward the street. He heard more shots, was not sure if someone was shooting at him, and thought he was being chased. Defendant saw Wheeler and Price down the street and met up with them at the car. Defendant said Wheeler admitted to shooting McCurty when they were in the car.

¶ 38 When asked why he did not tell the detectives his story before, defendant said his mother and others had told him not to talk. Bradbury told defendant his story was consistent with the accounts of others. Near the end of the interview, defendant gave Bradbury the password for his phone and asked if it would be held against him if there were pictures of him with guns on his phone. He mentioned, "I got the big a\*\* guns" that were used to "smoke" someone.

¶ 39 After playing the interview, the following colloquy occurred between the State and Bradbury:

"Q. You sat with the Defendant on December 12th, 2019[,] and January of 2020. Do you think after you spoke with the Defendant on January 8th, 2020[,] that he told you the complete truth about what happened on December 9th?

A. No.

Q. Why?

A. In my experience with interviewing people, over 15 years being a cop, a lot of people who when they're caught, even if they tell a portion of the truth, they generally minimize their involvement, so if three people go to an apartment and they're going to commit a robbery, and one person is caught and is basically

- 12 -

put on the carpet to answer for what he did, then he may try to blame everything on the other two people who aren't there and aren't being questioned and can't defend themselves.

Are you asking for my opinion based on the totality of the investigation?

Q. Yes.

A. Based on everything that I've seen in this investigation, I believe they went there to commit a robbery. They saw that James Pulliam had cannabis for sale, they saw James Pulliam posted videos of what appeared to be thousands of dollars in cash. He and in his own words agreed with my statement that James Pulliam's kind of soft, and would be an easy target for a robbery. I believe they went there to commit a robbery and the subjects in the apartment resisted being robbed and one of them was shot."

¶ 40　　　　Defense counsel did not object. On cross-examination, defense counsel asked Bradbury if it was common for a person committing a robbery to show their face or disclose their name. Bradbury stated he believed that was what happened.

¶ 41　　　　Following the State's presentation of evidence, the trial court denied defendant's motion for a directed verdict. Defendant testified he was home on December 9, 2020, when a friend messaged him to come over. He eventually went to hang out in Wheeler's basement. There were seven or eight people there, including Price. The group was rapping, making Snapchat videos, smoking, and drinking. Defendant testified the guns he held in the videos did not belong to him. He said he searched for auto switches out of curiosity after his friends were discussing guns. He did not search with the intent to modify a gun that did not belong to him.

¶ 42　　　　Defendant admitted he saw Pulliam's Snapchat video of Pulliam holding a large

sum of money but said he did not pay attention to it. He said he overheard Wheeler, Price, and others talking about a "lick." Defendant did not hear any details about robbing a specific person or at any specific location or time.

¶ 43 Defendant testified the group smoked all the cannabis they had. Price left and returned 20 to 30 minutes later. Price told the group he had purchased cannabis from Pulliam but smoked it all. However, he said Pulliam had more for sale. Meanwhile, Pulliam sent defendant a message saying he had an ounce for sale for $180 or $190. Defendant, Wheeler, and Price decided to pool their money together and buy the ounce. Defendant said they parked in the nearby parking lot because Wheeler was on house arrest and did not want to be seen by the police, who were often in the area of McCurty's apartment. The group walked toward McCurty's apartment, and they had to walk over a small creek in a small, wooded area.

¶ 44 Defendant said he did not know anyone was armed when they left. Price let them know when they were at the right building. Wheeler looked in a back window and said it was the right place. Defendant knocked on the door while the others waited off to the side. The plan was to have defendant purchase one gram of the cannabis to test its quality before deciding if they would buy the whole ounce. Pulliam opened the door, and defendant told him that Price had just bought some cannabis, and they wanted to buy some more.

¶ 45 As defendant entered the apartment, Pulliam tried to close the door, and defendant said "hold on" because his friends were outside, and he wanted them to see the cannabis. Defendant said Wheeler then pushed the door and defendant heard a "boom." A man at the sink washing dishes said "hell, no," and tried to push the door shut. The man struggled with someone and was "punching through the door." Defendant next saw a silver gun appear through the door, and a shot went through the door. Defendant then ran out the back door. Someone chased him,

and he heard more shots. Defendant eventually met up with Wheeler and Price at the car. Wheeler said he shot the man and thought he killed him. Wheeler and Price dropped defendant off at his home after getting rid of the gun.

¶ 46 Defendant testified he told his mother what happened, and she told him to "hold on" and calm down. Wheeler and Price were texting him for days, and Wheeler asked whether the police questioned him. Defendant did not call the police and did not tell the truth during the first interview because he was afraid of being charged and he was afraid of what Wheeler would do to him or his family if he told the police what had happened. He said he told the truth at the second interview. Defendant testified he was still afraid for his family's life.

¶ 47 On cross-examination, defendant agreed Pulliam was "soft" and somebody that could be taken advantage of. Defendant said the guns in the videos were not his, and he never owned a firearm. He also said a "lick" did not refer to a robbery and instead could mean any "easy score" to get free money, such as getting $20 from his mother. In rebuttal, the State introduced defendant's prior conviction for unlawful use of a weapon based on his possession of a weapon without a firearm owners identification card.

¶ 48 In initial and rebuttal closing arguments, the State argued circumstantial evidence showed the shooting was a planned robbery that went wrong. In support of that argument, the State mentioned the Snapchat videos of defendant with a gun matching the description of the gun used and his search for possible auto-switch modifications of a 9-millimeter handgun. The State also played and referenced the portion of defendant's statement to Bradbury that he had a "big a*** gun" that was used to "smoke" someone.

¶ 49 The State also addressed defendant's first interview with Bradbury, arguing, when defendant was confronted, "He lied. He lied, he lied. I wasn't there. I don't know what happened.

Over and over and over again." The State then noted, "He was given time over and over again to tell the truth, to tell his version of the truth. To distance himself from this crime. But he continued to deny any involvement over and over." The State also noted when Bradbury discussed potential charges, defendant's response was, "I'll beat it." The State argued defendant also lied about calling his mother.

¶ 50    In closing, defense counsel argued the jury was able to see the lies defendant told Bradbury and see him tell the truth. Counsel then argued, "And then you also got to understand the fear. You snitch, you're dead. The highest price for something that you had zero planning of, something yourself was scared of." Counsel later argued defendant paid "the ultimate price for weed" and stated, "It's a high price of weed to live in fear if you say something, you're hurt. It's a high price for weed if your mother, your sister, they're hurt."

¶ 51    In rebuttal, the State argued defendant lied, not because he was scared, but because Wheeler would talk if interviewed and tell the police defendant was complicit. The State also told the jury:

> "I want to talk a little bit about what may be puzzling to you in my rebuttal. I read a prior felony conviction of the Defendant. This is the appropriate use of that. You should consider that at least at some point in the past he's put his own interests above society's. He said I'm going to commit this felony, I'm putting my interest above society's.
>
> The way you should look at that is is he a believable person? How does it affect his credibility if he's willing to put himself above society in that way? I would argue he's not credible. He has told lie after lie after lie, and seems inclined to tell any part of the truth only when that part of the truth is already known. And

then only to qualify and explain it away."

The trial court instructed the jury, "Evidence of a Defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 52    During deliberations, the jurors sent a note, asking, "Does 'intent' mean with prior planning or just with heat of moment actions?" In response, the trial court repeated the instruction defining intent, telling the jury, "A person intends to accomplish a result or engage in conduct when his conscious objective or purpose is to accomplish that result or engage in that conduct."

¶ 53    The jury found defendant guilty of all counts. Defendant moved for a new trial, arguing (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred in allowing evidence of his prior conviction, and (3) the court erred in admitting into evidence the Snapchat videos of defendant handling the guns. The court denied the motion. After merging various counts, the court sentenced defendant to consecutive terms of 22 years for attempted murder and 6 years for aggravated discharge of a weapon.

¶ 54    This appeal followed.

¶ 55                              II. ANALYSIS

¶ 56    On appeal, defendant contends (1) counsel rendered ineffective assistance by failing to (a) move to suppress statements defendant made to police detectives after defendant told them he did not feel like talking anymore and (b) object to Bradbury's opinion testimony that defendant was lying and allowing Bradbury to give an opinion regarding the ultimate issue in the case, (2) the trial court erred in failing to suppress evidence of Snapchat videos showing him holding guns and the Google search inquiring how to modify a gun, (3) the court erred in

allowing the State to present evidence of his prior conviction of unlawful use of a weapon, and (4) the State failed to prove him guilty beyond a reasonable doubt.

¶ 57                                     A. Ineffective Assistance of Counsel

¶ 58         Defendant contends counsel rendered ineffective assistance by failing to (1) move to suppress statements defendant made to police detectives after defendant told them he did not feel like talking anymore and (2) object to Bradbury's opinion testimony that defendant was lying and defendant went to McCurty's apartment intending to commit a robbery.

¶ 59         Claims of ineffective assistance of counsel are evaluated under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must show counsel's performance fell below an objective standard of reasonableness, and the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687-88. The failure to establish either prong of the *Strickland* test is fatal to a defendant's claim. *People v. Ceja*, 204 Ill. 2d 332, 358 (2003).

¶ 60                                     1. *Failure to File a Motion to Suppress*

¶ 61         Defendant first contends trial counsel rendered ineffective assistance when he failed to file a motion to suppress defendant's statements in his first interview with Bradbury because Bradbury continued to interrogate him after he twice invoked his right to remain silent.

¶ 62         The United States Supreme Court, in *Miranda*, 384 U.S. at 471, held that before an accused can be subject to custodial interrogation, he must be advised of his rights, including the right to remain silent, the right to consult with an attorney, and the right to have an attorney present with him during an interrogation. The United States and Illinois Constitutions also provide no person should be compelled in any criminal case to be a witness against himself. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. To protect this right, the interrogation of an

accused must cease once the accused indicates in any manner and at any time before or during a custodial interrogation that he wishes to remain silent. *Miranda*, 384 U.S. at 444-45; *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005). Any statement taken after the individual invokes the right to remain silent cannot be other than the product of compulsion, subtle or otherwise. *Hernandez*, 362 Ill. App. 3d at 785. The invocation of the right to silence must be "scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 103-04.

¶ 63            However, an assertion of the right to remain silent must be clear, unambiguous, and unequivocal. *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 33. This right may be invoked either verbally or through conduct clearly indicating a desire to cease all questioning. *Kronenberger*, 2014 IL App (1st) 110231, ¶ 33. If verbal, the demand must be specific. *Kronenberger*, 2014 IL App (1st) 110231, ¶ 33. We examine such statements in the factual context of their utterance. *People v. Milner*, 123 Ill. App. 3d 656, 660 (1984). Whether a statement constitutes a clear and unequivocal assertion depends on how a reasonable police officer would perceive the defendant's words. See *Davis v. United States*, 512 U.S. 452, 459 (1994). An interrogator's response to a defendant's purported invocation of the right to remain silent is also often relevant. *People v. Ward*, 2023 IL App (1st) 190364, ¶ 115. A defendant's statement he or she did not want to talk shortly after being given *Miranda* warnings may assist in determining whether an invocation of the right was unequivocal. See *People v. Flores*, 2014 IL App (1st) 121786, ¶ 31. However, the temporal distance between *Miranda* warnings and an alleged invocation is not determinative in considering the issue. *Ward*, 2023 IL App (1st) 190364, ¶ 113.

¶ 64            Statements such as " 'I ain't got nothin' else to say,' " " '[g]ot nothin' to say,' " and " 'don't want to say nothing else about it,' " have been held to clearly invoke the right to

silence. *Ward*, 2023 IL App (1st) 190364, ¶ 102. Likewise, where a defendant stated, " 'I don't wanna answer no more questions, 'cause I can't help you. And I don't wanna dig myself into a hole' " (*Ward*, 2023 IL App (1st) 190364, ¶ 114), and the investigator left and ceased the interrogation for almost four hours, the statement was a clear and unequivocal invocation of the right to remain silent. *People v. Cox*, 2023 IL App (1st) 170761, ¶ 52.

¶ 65        On the other hand, if a defendant makes a statement that may or may not be an invocation of his or her right to silence, police may continue to question the individual. The statement: " 'I'm tired, I can't answer no more,' " has been held ambiguous when the defendant wanted to rest before police continued to interview him. *Milner*, 123 Ill. App. 3d. 656, 658 (1984); see *People v. Troutman*, 51 Ill. App. 3d 342, 344 (1977) (holding the defendant's statement she was not going to make a confession was not specific enough to constitute a demand that questioning cease).

¶ 66        Further, a statement has been held to not clearly invoke the right to silence where the defendant placed a condition on speaking to officers, stating, " 'Can we get off the record then because I'm not going to say anything else on the record,' " followed a minute later by, " 'I'm not saying nothing right now though,' " while waving his hand toward an audio recorder. *People v. Reichert*, 2023 IL App (5th) 180537, ¶ 88. There, the appellate court held the first statement explicitly indicated the defendant did not want to say anything on the record, not that he did not want to talk at all. *Reichert*, 2023 IL App (5th) 180537, ¶ 89. While the second statement, read in isolation, would appear to invoke the defendant's right not to speak, in context, and based on the defendant's action of waving his hand toward the audio recorder, the statement was not a clear invocation because defendant indicated his cooperation was conditioned upon speaking off the record. *Reichert*, 2023 IL App (5th) 180537, ¶ 90.

¶ 67 Here, defendant's first purported invocation of his right to remain silent was made in the context of a discussion of the evidence against him. In the context of that discussion as a whole, and having viewed the video and observed defendant's mannerisms and vocal inflections, we conclude defendant did not unambiguously or unequivocally invoke his right to silence. Instead, it was reasonable for the detectives to view defendant's statements, not as an invocation of his right to silence, but instead as a conditional assertion he did not want to talk unless the officers showed him the evidence they were referring to. While Bradbury acknowledged defendant's right to remain silent during the discussion, he also reminded defendant he read him his *Miranda* rights, and defendant then continued to speak to officers despite that reminder. Thus, based on the full context of that portion of the interrogation, we interpret defendant's statement, "I don't feel like talking about anything," as a part of his continuing request to see more evidence and a suggestion he would continue to deny involvement without it. Accordingly, a motion to suppress the first purported invocation of defendant's right to remain silent would not have merit. Therefore, counsel did not provide deficient representation regarding that instance.

¶ 68 However, we find the second purported invocation was clear and unambiguous. There, defendant's statement, "Look, I don't feel like talking right now," was not conditioned upon anything, came shortly after a period in which defendant sat silent, refusing to answer questions, and was made in response to Bradbury asking defendant to tell him what happened. When defendant stated he did not want to talk, Bradbury acknowledged he could not force defendant to talk but then continued to interrogate him. Thus, he failed to scrupulously honor defendant's right to remain silent.

¶ 69 Accordingly, we agree that had counsel moved to suppress defendant's statements

made after that point of the interview, such a motion should have been granted. Generally, defense counsel's decision not to file a motion to suppress evidence is a matter of trial strategy and does not constitute ineffective assistance. *Hernandez*, 362 Ill. App. 3d at 787. Here, however, nothing of value to defendant's case was contained in the video following defendant's invocation of his right to remain silent. Instead, as we discuss further when addressing prejudice, after defendant invoked his right, he continued to lie about his presence at the shooting and lied about making a phone call to his mother, which was used against him at trial. We are unable to discern a valid trial strategy for allowing that evidence. See generally, *Hernandez*, 362 Ill. App. 3d at 787. Thus, counsel's performance fell below an objective standard of reasonableness.

¶ 70                            2. *Failure to Object to Opinion Testimony*

¶ 71            Defendant next contends trial counsel rendered ineffective assistance by failing to object to Bradbury's opinions defendant was lying in his interviews and the group went to McCurty's apartment planning to commit a robbery. Defendant argues Bradbury's testimony was inadmissible because he was not qualified as an expert and it was improper commentary on defendant's credibility.

¶ 72            Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) states:

"If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

¶ 73            Under Illinois law, " 'the testimony of a lay witness must be confined to

statements of fact of which the witness has personal knowledge.' " *People v. McCarter*, 385 Ill. App. 3d 919, 934 (2008) (quoting *People v. Brown*, 200 Ill. App. 3d 566, 578 (1990)). However, a witness is not permitted to comment on the veracity of another witness's credibility. *People v. Munoz*, 398 Ill. App. 3d 455, 487 (2010). Further, "[a] lay witness may not express an opinion or draw inferences from the facts." *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001). This is so because "testimony must be confined to statements of fact of which the witness has personal knowledge." *Crump*, 319 Ill. App. 3d at 542. "Lay opinion testimony on the ultimate question of fact for the jury is particularly improper and prejudicial." *People v. Suggs*, 2021 IL App (2d) 190420, ¶ 12; see *Crump*, 319 Ill. App. 3d at 542. It is the function of the trier of fact to assess the credibility of the witnesses, determine the appropriate weight of the testimony, and resolve conflicts or inconsistencies in the evidence. *People v. Evans*, 209 Ill. 2d 194, 211 (2004).

¶ 74          While it is improper for an officer to express an opinion as to a defendant's present credibility or guilt, "statements of past opinions, rather than present ones, do not constitute improper lay opinion testimony." *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 58 (citing *People v. Hanson*, 238 Ill. 2d 74, 101 (2010)); see *People v. Martin*, 2017 IL App (4th) 150021, ¶ 32 (holding a police officer's "testimony was not an improper lay opinion because it was not offered as a present opinion on [the] defendant's credibility but, rather, was a statement of past belief offered to explain the course of investigation"). Thus, "present opinion testimony is improper," while "previous opinion testimony is permissible." *People v. Degorski*, 2013 IL App (1st) 100580, ¶ 84. But, even when some portions of the testimony refer to the past tense, where the jury would have understood the testimony to be a present opinion, allowance of the opinion is in error. See *Suggs*, 2021 IL App (2d) 190420, ¶ 18.

¶ 75          Here, we disagree the testimony was inadmissible because Bradbury was not

qualified as an expert. Bradbury's opinion was rationally based upon his perceptions of the evidence and his conversations with defendant, and it was not based upon scientific, technical, or specialized knowledge. See *Martin*, 2017 IL App (4th) 150021, ¶ 29. However, Bradbury's statements he believed defendant was untruthful and his belief the group intended to commit a robbery were improper and prejudicial.

¶ 76　　　　Bradbury's testimony clearly commented on defendant's credibility and the ultimate inference defendant went to McCurty's apartment with the intent to commit a robbery. While the initial questioning referred to Bradbury's belief regarding the past interviews, the ultimate questions referenced the present tense. For example, after testimony about the first interview, the State asked, "*Do you think* the defendant was telling you the truth during this interview?" (Emphasis added.) After testimony regarding the second interview, the State asked, "*Do you think* after you spoke with defendant on January 8th, 2020[,] that he told you the complete truth about what happened?" (Emphasis added.) Bradbury's answers of, "Absolutely not," and, "No" to those questions would reasonably be interpreted by the jury to be a current opinion defendant was untruthful. Then, after clarifying he was being asked his opinion based on the totality of the investigation, Bradbury also stated, in the present tense, "*I believe* they went there to commit a robbery," and, "*I believe* they went there to commit a robbery and the subjects in the apartment resisted being robbed and one of them was shot." (Emphases added.) As a whole, the testimony served no other purpose than to impermissibly comment on defendant's credibility and the ultimate inference to be drawn in the case regarding whether the group went to McCurty's apartment seeking to commit a robbery. See *Munoz*, 398 Ill. App. 3d at 488 (allowance of detective's agreement with the question the defendant "never told you the truth, did he?" was in error). Thus, had counsel objected, the testimony should not have been allowed.

¶ 77          We also are unable to discern a reasonable trial strategy for allowing the testimony. The State argues Bradbury's testimony allowed defendant to ask Bradbury if it was common for a person committing a robbery to show their face and announce their name. However, counsel could have elicited that testimony without Bradbury providing improper testimony. Thus, we do not view that as a reasonable strategy. Accordingly, counsel's performance fell below an objective standard of reasonableness.

¶ 78                                    3. *Prejudice*

¶ 79          Having determined defense counsel's performance fell below an objective standard of reasonableness, we next address prejudice. The State contends any errors did not result in prejudice based on the overwhelming evidence against defendant. We disagree.

¶ 80          To show prejudice, a defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A "reasonable probability" is "defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair." *People v. Patterson*, 2014 IL 115102, ¶ 81.

¶ 81          The failure to file a motion to suppress will constitute ineffective assistance if there is a reasonable probability that the motion would have been granted and the outcome of the trial would have been different. *Hernandez*, 362 Ill. App. 3d at 787. Regarding Bradbury's opinion testimony, as previously noted, "[l]ay witness testimony is especially improper and prejudicial when it goes to the ultimate question of fact that is to be decided by the jury." *Crump*, 319 Ill. App. 3d at 542. "A police officer is a figure of authority whose testimony may be prejudicial if the officer informs the jurors that they should believe a portion of the prosecution's case." *Crump*, 319 Ill. App. 3d at 542.

¶ 82        Here, the evidence against defendant depended primarily on the jury's evaluation of his credibility. A central theme of the State's case was based on defendant's lies during his first interview, including his lie about calling his mother. However, that evidence should have been excluded because it arose out of the interview after defendant invoked his right to remain silent. Then, the State was improperly allowed to elicit opinion testimony from Bradbury that not only did defendant lie in both of his interviews, but Bradbury also believed defendant went to McCurty's apartment with the intent to commit a robbery. Thus, Bradbury's testimony accentuated the improperly admitted evidence for the first interview, improperly commented on the second interview, and then presented the jury with an overall improper opinion on the ultimate determination to be made in the case when defendant's credibility was particularly at issue. As a result, Bradbury's testimony was especially prejudicial when considered in light of the State's theme of the case that defendant repeatedly lied about what happened. We also note, during deliberations, the jurors sent a note, asking, "Does 'intent' mean with prior planning or just with heat of moment actions?" Thus, the record indicates the jury struggled with deciding the case, making the issue of defendant's credibility even more pertinent.

¶ 83        Further, the prejudice was enhanced by the combination of the two errors. Where individual errors cast doubt upon the reliability of the judicial process, a court may find cumulatively the errors created a pervasive pattern of unfair prejudice to the defendant's case. *People v. Blue*, 189 Ill. 2d 99, 139 (2000). In such circumstances, the defendant's conviction should be reversed and the matter remanded for a new trial. *Blue*, 189 Ill. 2d at 140.

¶ 84        Here, even if we were to find either error, standing alone, insufficient to undermine confidence in the outcome of the trial, when combined, we find the errors rendered the result unreliable and fundamentally unfair. See *Blue*, 189 Ill. 2d 99, 138-39. Accordingly, we

find defendant has shown prejudice, and we reverse and remand for a new trial.

¶ 85    Although we reverse and remand for a new trial, we address defendant's remaining arguments in anticipation of the issues arising again on retrial.

¶ 86                B. Admission of Snapchat Videos and Google Search History

¶ 87    Defendant contends the trial court erred in failing to suppress evidence of the Snapchat videos. He also argues the court plainly erred, or counsel rendered ineffective assistance, by allowing Bradbury to give opinion testimony about defendant's credibility.

¶ 88                                    1. *Snapchat Videos*

¶ 89    Defendant contends the trial court erred in allowing evidence of the Snapchat videos showing him handling two guns. He argues the evidence was irrelevant when he was not armed and did not fire a gun at McCurty's apartment and, if relevant, the evidence was more prejudicial than probative.

¶ 90    Illinois Rule of Evidence 402 (eff. Jan. 1, 2011) provides, "Evidence which is not relevant is not admissible." Meanwhile, all relevant evidence is admissible unless otherwise provided by law. *People v. Walker*, 2021 IL App (4th) 190073, ¶ 18. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶ 91    This court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v. Graves*, 2012 IL App (4th) 110536, ¶ 31. An abuse of discretion

occurs when the court's decision is arbitrary, fanciful, or unreasonable, or no reasonable person would agree with it. *Graves*, 2012 IL App (4th) 110536, ¶ 31.

¶ 92        Generally, evidence of a weapon may be admitted where there is proof to connect it with the defendant and the crime. *People v. McCasle*, 35 Ill. 2d 552, 559 (1966). In cases involving the admission of a weapon into evidence, "it is not necessary to establish that the particular weapon was the one which was actually used." *McCasle*, 35 Ill. 2d at 559. Where the proper connection is established and it is shown the defendant possessed a weapon which could have been used in the commission of the crime, it may be admitted into evidence. *McCasle*, 35 Ill. 2d at 559. Likewise, where it appears the defendant participated in a crime in which the weapon was used, the weapon may be admitted even though the defendant himself did not wield or possess it. *McCasle*, 35 Ill. 2d at 559.

¶ 93        We find the Snapchat videos relevant because they connected defendant's possession of the guns, including the specific gun used in the crime, to his presence at the crime scene. Defendant's handling of the guns showed his association and cooperation with Wheeler and Price in connection with possession of the guns, as all three men were present when the videos were made. That defendant held the gun used in the shooting an hour before was relevant to infer defendant knew Wheeler had that gun when they left for McCurty's apartment, and to further infer the intent of the group, including's defendant's intent, when the group left shortly after the last video was made. Thus, the evidence also cast doubt on defendant's defense that he did not know the two-toned gun was present when they went to McCurty's apartment. The State was not required to prove defendant actually used the gun at the crime scene, as he was tried under a theory of accountability.

¶ 94     To argue otherwise, defendant cites a series of cases in which evidence of guns was found irrelevant. However, those cases all involved circumstances in which the gun or guns at issue had no connection or relationship at all to the crime charged. Thus, in those cases, evidence of a gun was entirely irrelevant. See *People v. Starks*, 2014 IL App (1st) 121169, ¶ 63; *People v. Tucker*, 317 Ill. App. 3d 233, 241 (2000); *People v. Harbold*, 124 Ill. App. 3d 383, 384 (1984); *People v. Wade*, 51 Ill. App. 3d 721, 729-30 (1977). Such was not the case here. Instead, the guns, especially the two-toned gun, specifically connected defendant to the crime. Thus, the evidence was highly relevant and admissible.

¶ 95     The evidence was also not more prejudicial than probative. All evidence offered by the State at a criminal trial is prejudicial in that its purpose is to prove the defendant committed the charged offense or undermine the defense theory of the case. *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 120. The unfair prejudice of evidence begins to substantially outweigh its probative value when it has " ' "an undue tendency to suggest [a] decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." ' " *Martin*, 2017 IL App (4th) 150021, ¶ 19 (quoting *People v. Eyler*, 133 Ill. 2d 173, 218 (1989), quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 403.1 (4th ed. 1984)).

¶ 96     Here, as previously discussed, the evidence defendant handled the guns, including the gun used to shoot McCurty, was highly relevant. In light of that highly probative value, the trial court's conclusion the relevance and probative value of the evidence outweighed its prejudicial effect on defendant's case was not an abuse of discretion. See *People v. Fyke*, 190 Ill. App. 3d 713, 719 (1989).

¶ 97                                2. *Google Search History*

¶ 98          Defendant next contends evidence he searched Google regarding an auto switch

for a 9-millimeter handgun was irrelevant and more prejudicial than probative. Defendant

acknowledges he failed to object at trial or otherwise raise the issue in the trial court but argues

either plain error or ineffective assistance of counsel applies.

¶ 99          A defendant's failure to object at trial and to raise the issue in a posttrial motion

operates as a forfeiture of the right to raise the issue as a ground for reversal on review. *People v.*

*Harvey*, 211 Ill. 2d 368, 385 (2004). The plain-error doctrine provides a "narrow and limited

exception," allowing courts of review to address forfeited claims. *People v. Reese*, 2017 IL

120011, ¶ 72. Under the plain-error doctrine, a reviewing court may disregard a defendant's

forfeiture and consider an unpreserved claim of error where:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced
>
> that the error alone threatened to tip the scales of justice against the defendant,
>
> regardless of the seriousness of the error, or (2) a clear or obvious error occurred
>
> and that error is so serious that it affected the fairness of the defendant's trial and
>
> challenged the integrity of the judicial process, regardless of the closeness of the
>
> evidence.' " *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (quoting *People v.*
>
> *Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 100         Under both prongs of the plain-error doctrine, the defendant bears the burden of

persuasion. *People v. Wilmington*, 2013 IL 112938, ¶ 43. Forfeited claims may also be addressed

as a matter of ineffective assistance of trial counsel. Under either theory, we must determine

whether error occurred. Under the plain-error doctrine, the first step is to determine whether a

clear or obvious error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19. Similarly, to succeed

on a claim of ineffective assistance of counsel, a defendant must show an error by counsel. *People v. Perry*, 224 Ill. 2d 312, 342 (2007).

¶ 101     Here, evidence of the search was relevant to infer defendant had an ownership or possessory interest in the 9-millimeter weapon he held in the Snapchat videos before the shooting. Nor was the evidence particularly prejudicial in light of defendant's possession in the video of the gun matching the one used in the shooting and the overall strength of the case against him. Thus, for the same reasons we find the Snapchat videos were admissible, we find the same here. Thus, having found no error, there was likewise no plain error or ineffective assistance of counsel.

¶ 102                         C. Prior Conviction

¶ 103     Defendant next contends the trial court erred in allowing evidence of his prior conviction of unlawful use of a weapon for purposes of impeachment. He argues the evidence was more prejudicial than probative and the State misinformed the jury about how they could consider it.

¶ 104     Under what is often referred to as the "*Montgomery* rule," evidence of a witness's prior criminal conviction is admissible to impeach his or her credibility when (1) the conviction was for a crime punishable by death or imprisonment for more than one year, or the crime involved dishonesty or a false statement regardless of punishment; (2) less than 10 years has passed since the date of the conviction or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the conviction outweighs the danger of unfair prejudice. *People v. Montgomery*, 47 Ill. 2d 510, 516-17 (1971). In balancing the probative value of the prior conviction against its potential prejudice, the trial court should consider factors such as "the nature of the prior conviction, its recency and similarity to the present charge, other

circumstances surrounding the prior conviction, and the length of the witness'[s] criminal record." *People v. Atkinson*, 186 Ill. 2d 450, 456 (1999). While our supreme court has emphasized trial courts should be cautious in admitting prior convictions for the same crime as the crime charged, it has also noted similarity alone does not mandate the exclusion of a prior conviction. *Atkinson*, 186 Ill. 2d at 463.

¶ 105        "When the defendant testifies in a criminal case, the State may not impeach the defendant's testimony by cross-examination as to his or her prior conviction, but rather only by introducing the record of the prior conviction." *People v. Naylor*, 229 Ill. 2d 584, 594 (2008). The determination of whether a prior conviction is admissible for impeachment is within the trial court's discretion. *People v. Williams*, 173 Ill. 2d 48, 81 (1996).

¶ 106        Defendant concedes the first two requirements of the *Montgomery* rule were satisfied, but he argues evidence of his prior convictions should have been excluded because the danger of unfair prejudice outweighed any probative value. However, defendant's credibility was an important issue in the case. When a defendant's credibility is a "central issue," a prior conviction may be "crucial" in measuring the defendant's credibility. *Atkinson*, 186 Ill. 2d at 462. Further, defendant specifically testified he never owned a gun, making his recent conviction of unlawful use of a weapon particularly probative.

¶ 107        Meanwhile, any unfair prejudice from the conviction was not significant enough to find the trial court abused its discretion. While the prior conviction was the same as one of the charges in the case, as previously noted, that was particularly probative, given defendant's testimony he never owned a gun.

¶ 108        Defendant argues the State in closing misrepresented how the prior conviction could be considered when the State told the jury it showed defendant put his own interests above

society's. However, the State then immediately explained the jury should look at that to consider whether defendant was a believable person and how it affected his credibility. Thus, the full context of the State's closing argument was to use the conviction to properly argue the issue of defendant's credibility. Then, the trial court specifically instructed the jury to consider defendant's prior conviction only for the purpose of assessing defendant's credibility as a witness and not as evidence of his guilt of the offenses charged. Under these circumstances, the court did not abuse its discretion in finding use of the conviction more probative than prejudicial. See *Atkinson*, 186 Ill. 2d at 463.

¶ 109                                    D. Sufficiency of the Evidence

¶ 110        Finally, defendant contends the State failed to prove him guilty beyond a reasonable doubt. He argues the State failed to prove his involvement in the crime was anything more than seeking to buy cannabis.

¶ 111        We note the double-jeopardy clause does not preclude a retrial when a conviction has been overturned because of an error in the trial proceedings, but a retrial is barred if the evidence introduced at the initial trial was insufficient to sustain the conviction. *People v. Drake*, 2019 IL 123734, ¶ 20. A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). On a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies regardless of whether the evidence is direct or circumstantial, and circumstantial evidence meeting this standard is

sufficient to sustain a criminal conviction. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The determination of the credibility of each witness, the weight to be given to his or her testimony, and the resolution of any conflicts in the evidence is within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on those matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). "Moreover, the testimony of a single witness, if positive and credible, is sufficient to prove a defendant guilty beyond a reasonable doubt." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 62. Further, minor inconsistencies in the testimony do not, of themselves, create a reasonable doubt as to a defendant's conviction. *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993).

¶ 112　　　　Where evidence is improperly admitted, the proper remedy is a retrial rather than an outright reversal, as long as the properly and improperly admitted evidence, taken together, were sufficient to convict. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). This is true even if the properly admitted evidence alone would be insufficient to convict. *Olivera*, 164 Ill. 2d at 393. Also, when presented with a direct challenge to the sufficiency of the evidence, a reviewing court may consider improperly admitted evidence, along with the other trial evidence. *People v. Furby*, 138 Ill. 2d 434, 453-54 (1990); *People v. Peterson*, 2015 IL App (3d) 130157, ¶ 88.

¶ 113　　　　Defendant was convicted under an accountability theory based on the premise he went with Wheeler and Price to McCurty's apartment with the intent to rob him. A person is criminally accountable for the acts of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2018). Further,

　　　　　　"[w]hen 2 or more persons engage in a common criminal design or agreement,

any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." 720 ILCS 5/5-2(c) (West 2018).

¶ 114    Thus, a defendant may be found guilty on an accountability basis if the State establishes either (1) the defendant and the principal shared the same criminal intent or (2) there was a common criminal design. *People v. White*, 2016 IL App (2d) 140479, ¶ 21. An express agreement is not necessary to establish a common purpose to commit a crime, and accountability may be established by a defendant's knowledge of and participation in the criminal scheme, even without evidence of his direct participation in the criminal act itself. *People v. Hernandez*, 2017 IL App (2d) 150731, ¶ 22. Evidence a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of the group's design supports an inference the defendant shared the common purpose. *White*, 2016 IL App (2d) 140479, ¶ 22. Evidence a defendant was present at the scene, maintained a close affiliation with his companions after the crime, or failed to report the crime may be considered in determining his accountability. *Hernandez*, 2017 IL App (2d) 150731 ¶ 23. A defendant's intent or knowledge is rarely susceptible to direct proof and may be established by defendant's actions and surrounding circumstances supporting an inference that he had the requisite intent or knowledge. *Hernandez*, 2017 IL App (2d) 150731, ¶ 22; *White*, 2016 IL App (2d) 140479, ¶ 37.

¶ 115    " 'In cases where accountability is premised on shared intent, the appropriate

focus is on what the defendant knew about the [principal's] criminal intentions, as one cannot share an intent to promote or facilitate the commission of a crime when one does not know that a crime is going to be committed.' " *People v. Mathis*, 2024 IL App (1st), 211102, ¶ 47 (quoting *People v. Petrov*, 2023 IL App (1st) 160498, ¶ 75). However,

> "[u]nlike the shared-intent theory, under the common-design theory of accountability, the State does not need to prove that the defendant and the principal shared the same intent concerning the charged crime. [Citation.] Rather, the State only needs to prove that the defendant had the specific intent to promote or facilitate *a* crime." (Emphasis in original and internal quotation marks omitted.) *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 66.

¶ 116          Here, there was strong circumstantial evidence against defendant. The evidence clearly placed defendant at the scene of the crime, as he admitted to being there. The evidence was also strong defendant knew a robbery was planned. Defendant lied to police detectives and failed to report the crime, and there was evidence he maintained an affiliation with Price and Wheeler after the crime. In addition, defendant handled the gun used in the shooting shortly before the group left to go to McCurty's apartment. Defendant admitted seeing Pulliam's video showing what appeared to be large sums of money and hearing others discuss a "lick." He knew someone had a gun when they left Wheeler's residence. The group took actions that were arguably evasive by parking in a different location and walking to McCurty's apartment, and defendant told Bradbury he could "beat" charges if they were brought against him. Based on those circumstances, a reasonable trier of fact could infer defendant went to McCurty's apartment with the intent to commit a robbery or as part of a general criminal scheme. Accordingly, the evidence was sufficient to convict defendant beyond a reasonable doubt.

¶ 117                            III. CONCLUSION

¶ 118          For the reasons stated, we reverse and remand for a new trial.

¶ 119          Reversed and remanded.